UNITED STATES of America, Appellee,

v.

William W. LILLY, Defendant,
Appellant.

No. 91–2192.

United States Court of Appeals,
First Circuit.

Heard Nov. 3, 1992.

Decided Dec. 4, 1992.

Morris M. Goldings with whom Richard S. Jacobs and Mahoney, Hawkes & Goldings, Boston, MA, were on brief, for defendant, appellant.

Richard E. Welch, III, Asst. U.S. Atty., with whom A. John Pappalardo, U.S. Atty., and Stephen A. Higginson, Asst. U.S. Atty., Boston, MA, were on brief, for the U.S.

Before SELYA, CYR and BOUDIN, Circuit Judges.

SELYA, Circuit Judge.

In this appeal defendant-appellant William W. Lilly attacks his conviction on twenty-six counts of bank fraud. Lilly ranges his forces along three fronts. His first—and most substantial—assault raises a question of novel impression in this circuit concerning the bank fraud statute, 18 U.S.C. § 1344 (1990).[1] Lilly asseverates

---

1. The offenses of conviction were committed in 1986–1987. Although the bank fraud statute has been amended twice since 1987, the amendments do not bear directly on the issues before

that the statute, as construed by the government and the court below, resulted in a thirty-count indictment for what amounted to only two crimes, and that the avalanche of multiplicitous charges prejudiced his defense. His remaining forays feature allegations of prosecutorial misconduct. For the reasons set forth below, we affirm the judgment on only two of the counts of conviction.

## I.

### The Bank Fraud Statute

We set the stage for appellant's multiplicity challenge and thereafter analyze his contentions.

### A.

#### Background.

Appellant, a developer, rode the tide of New England's late, lamented real estate boom. In the mid–1980s, he sought to acquire an apartment complex for condominium conversion. First Mutual Bank for Savings (First Mutual) provisionally agreed to provide purchase-money financing subject to certain conditions. In an effort to meet these conditions, appellant began pre-selling condominium units. His approach was unorthodox: he pre-sold the units on a "no money down" basis, utilizing purchase-and-sale agreements which overstated each unit's purchase price and reported (falsely) that each buyer had made a down payment equalling around ten percent of the price. To flesh out this web of lies, appellant instructed the purchasers to sign loan applications which reflected the inflated sale prices and stated that the down payments came from the purchasers' "personal funds." The *pro forma* closing documents contained similar prevarications. After having dressed the transactions in this costumery, appellant gave the purchasers first mortgages for the "balance" of the purchase price from a trust that he controlled. Appellant then assigned the sales agreements, mortgages, and closing documents

to First Mutual as security for a $7,000,000 loan with which he acquired the apartment complex.

This fraud was the basis of twenty-nine counts in the indictment—one count for each of twenty-nine mortgages so assigned. A few months later, appellant sold his interest in the property, including the mortgages and false documentation, to Royal Palm Savings Association (Royal Palm) for roughly $9,000,000. This sale formed the basis for the indictment's final count (count 30). All the counts were premised on the bank fraud statute.

### B.

#### Analysis.

■ The Double Jeopardy Clause mandates that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. An indictment countervails this principle when it charges a defendant in more than one count with committing a single offense. *See United States v. Serino*, 835 F.2d 924, 930 (1st Cir.1987). Thus, the pivotal determinant in considering claims of multiplicity frequently centers on whether Congress intended the acts charged to constitute a single crime or plural offenses. *See id.*

■ The bank fraud statute, as it applied to Lilly's case, made it a crime for a person knowingly to

> execute[ ], or attempt[ ] to execute, a scheme or artifice—
>
> > (1) to defraud a financial institution; or
> >
> > (2) to obtain any of the moneys ... [of] a financial institution, by means of false or fraudulent pretenses, representations, or promises.

18 U.S.C. § 1344 (1990). Appellant contends that, because the first twenty-nine counts of the indictment all relate to a single scheme—obtaining the purchase-money loan from First Mutual—they involve one and the same crime.[2] He empha-

---

us. Thus, for ease in reference, we cite throughout to the current version of the statute.

**2.** During both the pre-trial and post-trial proceedings, appellant mounted seasonable chal-

sizes the plain language of section 1344, contending that the term "scheme" normally implies the existence of multiple acts directed toward a unitary end, and that the point is driven home in this setting by the statutory reference to executing the scheme "by means of false or fraudulent pretenses, representations, or promises." Thus, he argues, if a defendant has an overall plan in mind, he can be charged for carrying out that plan—but he cannot be charged independently for each separate step that he takes in bringing the plan to fruition.

We do not agree that the plain language of the statute settles the matter in the manner appellant suggests. That a criminal may plot on a large scale, envisioning a series of discrete acts as part of a grand plan, does not mean that various aspects of his felonious conduct cannot be separately charged under the bank fraud statute. The statute, after all, does not criminalize schemes or scheming per se; it criminalizes the execution (or attempted execution) of schemes. Phrased another way, the statutory terminology focuses on the fraudulent acts actually committed, or attempted, along with the effects of those acts,[3] rather than upon the distinctively different question of how a defrauder visualizes his plot.

■ Because a defendant's mindset is not, in and of itself, determinative of whether his acts can legally be said to constitute an execution of a single scheme as opposed to multiple executions of one or more schemes, the real question in this

appeal is whether a jury could plausibly find that the actions described in the first twenty-nine counts of the indictment, objectively viewed, constituted separate executions of the First Mutual scheme. Although the question is not free from doubt, we believe that it must be answered in the negative. Since the twenty-nine counts all relate to a single execution of a unitary scheme, they are multiplicitous.

Count 30 aside, twenty-five other counts remain in the case.[4] All of them relate to the defrauding of a single bank in connection with a single loan. The loan was designed to fund the purchase of a single apartment complex. By and large, the misrepresentations in the closing documents pertained to a single aspect of the transaction: whether the purchasers of individual units had made down payments.[5] In other words, appellant assigned to a single bank a single package of documents that consistently misstated a single material fact in order to obtain a single loan, the proceeds of which funded a single real estate purchase. We believe these facts are more comfortably categorized as a single execution of a scheme rather than as twenty-some-odd separate executions of a scheme.[6]

The government resists this assessment of the facts by arguing that the language of the bank fraud statute parallels the language of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343 (1990), and, therefore, should be construed in *pari passu*.[7] We disagree. Although the language in these three statutes is similar, and al-

lenges to the indictment on multiplicity grounds. The district court denied his motions.

3. We leave for another day whether Congress intended to require multiple misrepresentations in order to trigger criminal responsibility under section 1344. In this case, each of the counts is supported by ample evidence of multiple misrepresentations.

4. Four of the twenty-nine counts, viz., counts 8, 9, 10, and 11, dropped by the wayside at various points in the proceedings. Thus, those counts are of no moment.

5. To be sure, there is some evidence suggesting other chicanery. Lilly, for example, appears occasionally to have caused purchasers to overstate their assets on loan applications. The gov-

ernment has not argued that these details are relevant to the multiplicity challenge. For our part, we do not think they make any significant difference.

6. We do not think that this conclusion is undermined by the fact that twenty-nine sets of documentation were assigned to the bank as security for the loan.

7. Courts have routinely construed the mail and wire fraud statutes to criminalize each mailing or use of the wires employed in the execution of a scheme to defraud. *See, e.g., United States v. Fermin Castillo*, 829 F.2d 1194, 1198 (1st Cir. 1987); *United States v. Benmuhar*, 658 F.2d 14, 21 (1st Cir.1981), *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2927, 73 L.Ed.2d 1328 (1982).

though the legislative history suggests that Congress modeled the bank fraud statute on the other two statutes, *see* S.Rep. No. 225, 98th Cong., 2d Sess. 378, *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3519, these two facts do not tip the balance.

In the first place, the language in the three statutes, albeit similar, is not identical. For example, the mail fraud statute proposes to punish "[w]hoever, having devised or intending to devise any scheme or artifice to defraud ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office ... any matter or thing whatever." 18 U.S.C. § 1341. In contrast, the bank fraud statute proposes to punish "[w]hoever knowingly executes ... a scheme or artifice ... to defraud." 18 U.S.C. § 1344. Thus, the mail fraud statute criminalizes certain specifically enumerated actions when taken in furtherance of a scheme, while the bank fraud statute criminalizes only the execution of the scheme itself.[8] Nor do we think that this difference is unimportant; there will be cases, as here, in which the distinction is critical. Although Lilly's acts were unquestionably in furtherance of his scheme, we fail to discern how those acts constituted multiple executions of the scheme.

In the second place, the solace that the government derives from the legislative history is more apparent than real. The legislative history indicates that Congress modeled the bank fraud statute on the mail and wire fraud statutes because those statutes "have been construed by the courts to reach a wide range of fraudulent activity." S.Rep. No. 225, *supra*, 1984 U.S.C.C.A.N. at 3519. The interpretation which we give to the statute today does not constrict the range of fraudulent activity falling within the statute's reach.

In addition to relying upon parallelism and legislative history, the government also touts the precedential value of certain cases decided under the bank fraud statute. However, these are "check kiting" cases that find each utterance of a bad check to constitute an execution of a scheme to defraud. *See, e.g., United States v. Schwartz*, 899 F.2d 243, 248 (3d Cir.), *cert. denied*, 498 U.S. 901, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990); *United States v. Poliak*, 823 F.2d 371, 372 (9th Cir.1987), *cert. denied*, 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988). We have no quarrel with these decisions—but, they differ materially from Lilly's case. In check kiting schemes, more than one financial institution is ordinarily involved. More importantly, each check signifies a separate transaction requiring a separate issuance of money or credit on the part of the victimized bank. Here, as we have explained, the first twenty-nine counts of the indictment involve only one transaction, one bank, and one sum of money.[9]

■ We find a series of recent Fifth Circuit decisions to be particularly instructive on this point. In each of these cases, an indictment under the bank fraud statute was determined to be multiplicitous because the defendant's conduct amounted to only a single execution of a single scheme. *See United States v. Heath*, 970 F.2d 1397, 1402 (5th Cir.1992) (two separate loans were "integrally related" in that "one could not have succeeded without the other" so they were not separate executions of a scheme); *United States v. Saks*, 964 F.2d 1514, 1526 (5th Cir.1992) (holding that separate actions taken in connection with a single transaction to defraud three related banks were not separate executions of a scheme); *United States v. Lemons*, 941 F.2d 309, 318 (5th Cir.1991) (holding that

---

8. The same comparison can be drawn between the bank fraud and wire fraud statutes. To restate the particulars of the comparison would be supererogatory.

9. The other decisions cited by the government also involve the issuance of funds in more than one transaction. *See, e.g., United States v. Mason*, 902 F.2d 1434, 1436 (9th Cir.1990); *United*

*States v. Spambanato*, 687 F.Supp. 46, 47 (D.Conn.1988), *aff'd*, 876 F.2d 5 (2d Cir.1989). *See also United States v. Farmigoni*, 934 F.2d 63 (5th Cir.1991) (permitting two prosecutions to go forward because two different banks in two different states were involved), *cert. denied*, —— U.S. ——, 112 S.Ct. 1160, 117 L.Ed.2d 407 (1992).

checks written by co-schemers to each other were not separate executions of a scheme). In aligning ourselves with these cases, we neither initiate nor exacerbate a split in the circuits. Rather, we believe that *Schwartz* and *Poliak* are easily reconcilable with *Lemons* and its progeny; and that the range of decisions reflects the diversity of factors entering into an evaluation of multiplicity claims under the bank fraud statute—factors such as how many banks, how many transactions, and how many movements of money are involved. *See generally United States v. Mancuso,* 799 F.Supp. 567, 571 (E.D.N.C.1992) ("the common thread among the cases is that a scheme or artifice is 'executed' by the movement of money, funds or other assets from the institution"). Thus, the case law, like the statutory text and the legislative history, supports the conclusion that, on the facts of this case, the indictment is multiplicitous.[10]

### C.

### Remedy.

■ Ordinarily, when it is ascertained after trial and conviction that an indictment was multiplicitous, the remedy is simply to vacate the offending convictions and sentences.[11] *See, e.g., United States v. Rivera–Martinez,* 931 F.2d 148, 152–54 (1st Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 184, 116 L.Ed.2d 145 (1991); *United States v. Peacock,* 761 F.2d 1313, 1319–20 (9th Cir.), *cert. denied,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985); *see generally United States v. Bonavia,* 927 F.2d 565, 571 (11th Cir.1991) (stating that the remedy for conviction on a multiplicitous indictment is to vacate or reverse as to multiplicitous count(s) rather than to require a new

trial). Lilly, however, suggests that we fashion a different remedy in his case by vacating his conviction altogether, dismissing the surplus counts and ordering a new trial on counts 1 (the single viable First Mutual count) and 30 (the Royal Palm count). He bases this plea on the perceived risk that the jury was prejudiced by the prosecutor's overly ambitious charging decision.

We are unaware of any case in which so sweeping a remedy has been employed. Almost every successful post-conviction challenge to an indictment on multiplicity grounds necessarily contains within it the seeds for an assertion that the jury heard too many charges. In that sense, then, appellant is really asking that we rethink our long-settled practice in these cases. *See, e.g., United States v. Cowden,* 545 F.2d 257, 266 (1st Cir.1976) (rejecting similar complaint of jury prejudice), *cert. denied,* 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977); *accord United States v. Langford,* 946 F.2d 798, 804–05 (11th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1562, 118 L.Ed.2d 209 (1992). We see no basis for honoring this request.

■ Moreover, this particular case is an extremely poor candidate for special treatment. When a defendant is tried on multiplicitous charges, yet the same evidence would have been admissible against him had he been tried on a single, properly laid count, he cannot ordinarily complain of a spillover effect. So it is here: exactly the same evidence would have been introduced against Lilly had the indictment charged execution of the First Mutual scheme in a single count. Furthermore, the district court instructed the jury no

---

10. Even if we did find greater merit in the government's expansive reading of the bank fraud statute, the most that could be said is that the statute is ambiguous. In such a circumstance, the doctrine of lenity would have pertinence, for courts should normally resolve statutory ambiguity in favor of criminal defendants. *See, e.g., McNally v. United States,* 483 U.S. 350, 359–60, 107 S.Ct. 2875, 2881–82, 97 L.Ed.2d 292 (1987) (construing mail fraud statute); *see also United States v. Borowski,* 977 F.2d 27, 31–32 (1st Cir.1992).

11. In certain cases, it may be desirable to vacate the entire sentence and remand for resentencing. *See generally United States v. Pimienta–Redondo,* 874 F.2d 9 (1st Cir.1989) (en banc). Neither side has requested that we consider such a course in the instant case; and, given that the district court imposed a five-year sentence on count 1 (the statutory maximum under the law as it stood when Lilly executed the First Mutual scheme), we see no point in ordering that Lilly be sentenced anew.

fewer than seven times that the government's proof on each of the charges had to be weighed separately. Hence, we have no cause to believe that the jury bootstrapped appellant into these convictions by fitting together, like Garanimals, mismatched evidence from disparate charges.

We will not wax longiloquent. Appellant was sentenced to suspended five-year terms on all the multiplictous counts (2–7; 12–29). We resolve the multiplicity question by ordering that the judgments of conviction and the accompanying sentences on those twenty-four counts be vacated. No other aspects of the judgment must be revisited. The conviction, five-year term of immurement, and $50 special assessment on count 1 may stand. The conviction, five-year suspended sentence, and $50 assessment on count 30, which involved the execution of the Royal Palm scheme, may likewise stand. And, because the court-ordered requirement for restitution was imposed in connection with count 30, that portion of the sentence is similarly unaffected.

## II.

### *The Prosecutor's Question*

The next issue raised on appeal is whether a question posed to a defense witness constituted an impermissible comment on Lilly's failure to testify. In the circumstances of this case, we do not believe that the prosecutor's question prejudiced the defendant's substantial rights.

---

**12.** The court stated in part:
[T]he way that question was asked, ... it sounded to me like it was suggesting that somehow Mr. Lilly had something to say here, *if he were honest or something like that.* Nothing could be further from the truth. That's not how trials work. That's not how cases are tried. Mr. Lilly doesn't have to explain anything. He is no less honest nor more honest if he does what anyone is entitled to do, and that is make the government prove the case beyond a reasonable doubt. It would be an outrage, and I would stop this proceeding if I thought you were getting the idea that somehow if he didn't testify he's not honest. He doesn't have to say a word.... I will not have it that there is ... the least *suggestion here that if he doesn't testify himself,* he's not an honest person....

## A.

### Background.

You would agree with me, would you not, that a very honest person would testify truthfully in court?

This carelessly worded question, posed by the Assistant United States Attorney (AUSA) in cross-examining a character witness, prompted the current brouhaha. When defense counsel objected and moved for a mistrial, the prosecutor noted that, since the witness had extolled appellant's reputation for honesty and veracity, he wanted to lay a foundation for questioning the witness anent appellant's untruthful testimony in a different judicial venue. The explanation was plausible; the AUSA had in hand an opinion filed by a state judge in certain Housing Court litigation finding that appellant was not a credible witness.

The district court denied appellant's motion for a mistrial instead giving the jury a forceful instruction, the burden of which is quoted in the margin.[12] Before and after this lengthy soliloquy, the court explained the intended context of the prosecutor's question, emphasizing that it concerned "some other court proceeding." In response to the judge's inquiry, defense counsel acknowledged that the instruction was satisfactory.[13]

## B.

### The Applicable Legal Standard.

Prosecutorial comment on an accused's failure to testify frustrates the defendant's

---

So that question was out of line, to the extent that any of you got the idea that [the AUSA] was asking a question that had anything to do with this proceeding.... [Allowing such a tactic] turns the whole thing on its head. It [would mean] that the government could go in and say, okay, we charge you with a crime, come and tell us why you're not guilty. Can't be done in our system. Unfair. The Constitution protects us all against that sort of overreaching. The government made these charges. Let the government prove them, beyond a reasonable doubt.

**13.** Notwithstanding this expression of satisfaction, counsel preserved his objection to the court's refusal to declare a mistrial.

exercise of his Fifth Amendment rights and, for this reason, cannot be tolerated. The Supreme Court has long maintained strict rules aimed at eliminating such conduct. *See, e.g., Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). We, too, proscribe even indirect comment by overzealous prosecutors on a criminal defendant's failure to testify. *See, e.g., United States v. Lavoie,* 721 F.2d 407, 408 (1st Cir.1983), *cert. denied,* 465 U.S. 1069, 104 S.Ct. 1424, 79 L.Ed.2d 749 (1984); *Rodriguez–Sandoval v. United States,* 409 F.2d 529, 531 (1st Cir.1969).

█ Context frequently determines meaning. Therefore, a prosecutor's remarks must be examined in context rather than in isolation in order to ascertain if Fifth Amendment concerns are implicated. *See United States v. Robinson,* 485 U.S. 25, 33, 108 S.Ct. 864, 869, 99 L.Ed.2d 23 (1988); *Lussier v. Gunter,* 552 F.2d 385, 388–89 (1st Cir.), *cert. denied,* 434 U.S. 854, 873, 98 S.Ct. 171, 221, 54 L.Ed.2d 124, 153 (1977). In conducting this tamisage, a court must ask "whether, in the circumstances of the particular case, the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Glantz,* 810 F.2d 316, 322 (1st Cir.), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987) (citations and internal quotation marks omitted); *see also United States v. Babbitt,* 683 F.2d 21, 24 (1st Cir.1982); *United States v. Savarese,* 649 F.2d 83, 87 (1st Cir.1981); *Lussier,* 552 F.2d at 389. Withal, an inquiring court must keep matters in perspective:

> [A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*Donnelly v. DeChristoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974). While a court must not hesitate to vacate a conviction when an improper comment has indelibly stained a criminal trial, *see, e.g., United States v. Flannery,* 451 F.2d 880 (1st Cir.1971), the court has a correlative duty to uphold a conviction when the challenged comment, viewed in light of all the relevant circumstances, is a mere blemish which has not permanently discolored the trial's integrity.

## C.

### Analysis.

█ In this instance we do not believe that the AUSA's question, taken in context, justifies reversal. We have several reasons for so holding. We list five.

First, the AUSA's question had a legitimate purpose and was not in any sense a deliberate attempt to distance Lilly from the protections of the Fifth Amendment. There is simply no indication that the question either was intended to be, or, given the circumstances, was likely to be construed as, a comment on appellant's failure to testify.

Second, the question does not literally refer to the defendant's *failure* to testify, but suggests that a "very honest person" would "testify truthfully." The specific context in which the question was asked reinforces the notion that a literal interpretation is the most natural interpretation here. The character witness testified on direct examination that he thought Lilly was honest. In cross-examination, the prosecutor asked a number of questions seeking to disabuse the witness of this opinion (*e.g.,* "Would it change your opinion if you knew that Mr. Lilly had caused a series of false statements to be submitted ...?"). It was as part and parcel of this interrogation that the AUSA propounded the challenged question. Given this mise-en-scene, we see no error in concluding that, in the ordinary course of events, jurors would probably take the question to refer to the issue of truthfulness rather than to the defendant's right to remain silent.

Third, this case concerns a solitary question which, if misconduct at all, is fairly characterizable as an "isolated instance." *United States v. Cox,* 752 F.2d 741, 746

(1st Cir.1985). Significantly, the lone question was interposed before the defense rested its case. As such, the likelihood that the jurors would take the question as referring to appellant's failure to testify was diminished because they had not yet been informed whether or not he would testify.

Fourth, the district judge's intervention was swift and his message clear. He gave a strong prophylactic instruction that placed the AUSA's question in its proper niche, emphasized that the question concerned "some other court proceeding," and forbade any other illation. At the time, defense counsel did not seek to improve upon the court's cautionary instruction and, in post-conviction motions, described the instruction as "terrific." We have repeatedly held that a strong message from the bench, delivered promptly, is a satisfactory antidote to the potentially poisonous effects of an ambiguous comment or a remark that sails too close to the wind. *See, e.g., United States v. Mejia–Lozano*, 829 F.2d 268, 273–74 (1st Cir.1987); *Cox*, 752 F.2d at 746; *Lussier*, 552 F.2d at 389.

Finally, when the dust settled, the AUSA proceeded to interrogate the witness about whether his opinion of appellant's truthfulness would change if he knew that a state judge had found appellant's testimony in an unrelated civil proceeding to be unbelievable. We think it is evident that the questioning which followed the judge's instructions removed all doubt that the remark concerned truthfulness rather than silence.

The district court has a far better vantage point than an appellate panel from which to measure the likely effect and impact of wayward comments. Here, the court denied appellant's motion for a mistrial and his motion for relief notwithstanding the verdict. Mindful of the considerations enumerated above, we cannot say that the lower court abused its discretion in

denying these motions. The prosecutor's question, though infelicitously phrased, did not transgress Lilly's Fifth Amendment rights. *See Lavoie*, 721 F.2d at 408 (no reversible error found in comment, "you might ask yourself what has Mr. Lavoie put between himself and the truth?"); *Babbitt*, 683 F.2d at 23–24 (no reversible error found in comment, "While you search out the truth you may wish to ask yourself, 'Who has appeared before me in the form of a witness?' "); *Lussier*, 552 F.2d at 389 (no reversible error found in comment, "There's only one person who could tell us" how defendant lured murder victim to scene of crime).

We hasten to add that, even if the prosecutor's question was out of bounds, a new trial would not be warranted here. To determine if the stain could be removed, a reviewing court would look to "the severity of the misconduct, whether it was deliberate or accidental, the context in which it occurred, the likely curative effect of the judge's admonitions and the strength of the evidence against the defendant." *United States v. Ingraldi*, 793 F.2d 408, 416 (1st Cir.1986) (citations omitted). In this case, all five factors weigh in favor of allowing the verdict to stand. The conduct was not extreme; there is no evidence that the question was interjected as a calculated attempt to have the jury draw a forbidden inference; the context ameliorated any untoward effect; the judge's cautionary instruction was timely and definitive; and the evidence of Lilly's guilt was staunch.

We need not linger longer. Given the isolated nature of the allegedly offending question, the firm instructions of an able trial judge, and the absence of any cognizable prejudice to appellant's substantial rights, the court below did not err in refusing to declare a mistrial.[14] *See Mejia–Lozano*, 829 F.2d at 274 (holding that a prosecutor's improper comments require a new trial only when "the offending conduct

---

14. Appellant suggests that our decision in *Flannery*, 451 F.2d 880, requires reversal in the circumstances of this case. Here, however, the AUSA's motive was not blameworthy. His question was no worse than ambiguous. The trial court pounced on it; told the jury that, to the

extent the question could be interpreted as commenting on the defendant's silence, it "was out of line;" and gave a strong curative instruction. On these facts, *Flannery* does not demand appellate intervention.

so poisoned the well that the trial's outcome was likely affected" or when, alternatively, "the breach was so egregious that reversal becomes a desirable sanction to forestall future prosecutorial trespasses").

## III.

### *An Ax to Grind*

The final issue raised on appeal concerns a colleague of the prosecutor who allegedly bore a personal animus against the defendant—an animus that, in Lilly's view, ripened into a conflict of interest. Because we find no due process violation, we uphold the district court's rulings on this point.

### A.

#### Background.

Suzanne Durrell is a supervisor in the U.S. Attorney's office (civil division). In her private life, Durrell has been involved in litigation with Lilly wholly unrelated to her federal employment. The Housing Court opinion that the prosecutor used in cross-questioning the defense's character witness, *see supra* Part II, grew out of a case in which Durrell and Lilly were adversaries. It was Durrell who brought the opinion to the prosecutor's attention. And at the time of trial, Durrell had a claim pending against Lilly in a bankruptcy proceeding sparked by the Housing Court litigation.

Durrell had no official responsibilities in connection with the instant prosecution. Following the adverse jury verdict, however, appellant moved for a new trial due to Durrell's alleged conflict of interest. When the motion was argued, the prosecutor informed the court that he had discussed the case twice with Durrell. The first conversation occurred prior to trial when Durrell told the prosecutor of her personal interest and suggested that she be kept out of the loop. The second conversation occurred during the trial when the prosecutor, anticipating the possible advent of character witnesses, contacted Durrell in an effort to "dig up ... any public information" concerning appellant's truthfulness. In response to this inquiry, Durrell's personal attorney transmitted a copy of the Housing Court opinion to the prosecutor.

Appellant's counsel also made a statement. He accused Durrell of attempting to use her public office on earlier occasions to seek retribution against his client, and he submitted various documents that ostensibly buttressed this claim.

The district judge accepted as a fact, purely for argument's sake, that Durrell had used government resources in writing and sending several letters to Lilly concerning their adversary relationship. Nonetheless, he denied the motion for a new trial and rejected appellant's request for a full evidentiary hearing.

### B.

#### The Motion for New Trial.

Although appellant rails against Durrell's putative conflict of interest, he does not argue that the challenged conduct violates any specific statute or disciplinary rule. We, therefore, apply a due process analysis to appellant's claims.[15]

A substantive due process violation occurs when government conduct violates "fundamental fairness" and is "shocking to the universal sense of justice." *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960) (citations and internal quotation marks omitted); *accord United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973). This is a difficult row to hoe. *See United States v. Panitz*, 907 F.2d 1267, 1272 (1st Cir.1990) (collecting cases). Appellant has not succeeded in cultivating a sufficient showing. Notwithstanding that Durrell had an ax to grind, her conduct in furnishing the prosecutor with public information (or, technically, in causing her law-

---

**15.** This approach is consistent with the Court's holding that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982).

yer to supply it), does not shock our collective conscience. *Id.* at 1273. Mentioning two broad considerations suffices to prove the point.

First, the only allegation of improper interest concerns an attorney in the civil division who had no responsibility for criminal cases in general or for the prosecution of this case in particular. We think it is important that the prosecutor himself was appropriately disinterested.[16] Moreover, Durrell's actual involvement was restricted to a single incident. It consisted of providing the prosecutor with a copy of a judicial opinion that was in the public domain. It strains credulity to assert that so modest an involvement, even if motivated by an impure purpose, abridged the defendant's constitutional rights.[17] Cf., e.g., *Havens v. State of Indiana,* 793 F.2d 143, 145 (7th Cir.) (finding no due process violation where a prosecutor who had previously represented the defendant elicited on cross-examination information which was already a matter of public record), *cert. denied,* 479 U.S. 935, 107 S.Ct. 411, 93 L.Ed.2d 363 (1986).

Second, it is open to serious question whether, even on a worst-case scenario, Durrell's interest is the sort which implicates due process concerns. Prosecutors need not be empty vessels, completely devoid of any non-case-related contact with, or information about, criminal defendants. It is not surprising, therefore, that situations more insidious than this one have survived constitutional scrutiny. For example, courts have not found due process

violations when a prosecutor is simultaneously representing private clients who are suing the defendant on related matters, *see Dick v. Scroggy,* 882 F.2d 192, 194–97 (6th Cir.1989); *Jones v. Richards,* 776 F.2d 1244, 1247 (4th Cir.1985), or when a prosecutor is simultaneously the target of a civil action filed by an associate of the criminal defendant. *See United States v. Heldt,* 668 F.2d 1238, 1276–77 (D.C.Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982).[18]

We have said enough. Considering Durrell's minimal involvement in the instant case, the ready availability of the information transmitted, and the nature of her alleged conflict, we discern no error in the district court's denial of appellant's motion for a new trial.

## C.

*The Request for an Evidentiary Hearing.*

Appellant also seeks to convince us that the district court erred in refusing his request for an evidentiary hearing on the conflict-of-interest issue. We are not persuaded.

Federal courts are not obliged to provide evidentiary hearings on demand. *See Panitz,* 907 F.2d at 1273 (collecting cases).[19] Rather, we have developed a substantive test to be applied when a criminal defendant solicits an evidentiary hearing on a pre-trial or post-trial motion. In such situations, the movant must make an adequate threshold showing that material facts are in genuine doubt or dispute. *See*

---

**16.** We find instructive in this regard the Second Circuit's opinion in *United States v. Wallach,* 935 F.2d 445, 460 (2d Cir.1991) (finding no due process violation where defendants did not point to bias on the prosecutors' part and did not demonstrate prejudice stemming from the Attorney General's alleged conflict of interest).

**17.** We do not speculate about Durrell's motives but simply assume *arguendo* a worst-case scenario.

**18.** We think that the rationale of these cases draws sustenance from the Court's opinion in *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) (deciding that the rule barring coun-

sel for the beneficiary of a court order from accepting appointment to prosecute a contempt action for violation of that order was grounded on the Court's supervisory powers and not on the Constitution). *See Sassower v. Sheriff of Westchester County,* 824 F.2d 184, 191 (2d Cir. 1987) (holding that the arrangement dealt with in *Young* does not implicate the Due Process Clause); *see also Person v. Miller,* 854 F.2d 656, 662–64 (4th Cir.1988) (upholding a similar arrangement).

**19.** *Panitz,* like the case at bar, involved a defendant who asserted that a hearing was required to probe possible government misconduct allegedly violative of the Due Process Clause. *See Panitz,* 907 F.2d at 1273–74.

*id.; see also United States v. Abou–Saada*, 785 F.2d 1, 6 (1st Cir.) (remanding for evidentiary hearing because sufficient threshold showing was made), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986). If the district court abjures an evidentiary hearing, we will disturb its decision only for an abuse of discretion. *See Panitz*, 907 F.2d at 1274; *United States v. Carbone*, 798 F.2d 21, 29 (1st Cir.1986).

■ There is nothing approaching an abuse of discretion here. The district court did not turn a deaf ear to appellant's request but instead heard oral argument concerning the charge, permitted appellant to proffer exhibits buttressing his claim, and decided the motion "accept[ing] the representations as stated on the record [by appellant's counsel]." In effect, then, appellant received a hearing, albeit not precisely the kind of hearing that he preferred. No more was exigible. *Cf., e.g., United States v. Boylan*, 898 F.2d 230, 258 (1st Cir.) (holding that, where a defendant alleges jury misconduct, the "district court has broad discretion to determine the type of investigation which must be mounted") (collecting cases), *cert. denied*, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990).

We need go no further. A criminal defendant has no constitutional right to conduct a fishing expedition. In this case, appellant made no showing, in this court or below, that material facts were in doubt or dispute. His conclusory assertion that the prosecution's story is "incredible" does not, without more, warrant a full evidentiary hearing. Hence, the district court acted well within the realm of its discretion in denying appellant's request. *See United States v. DeCologero*, 821 F.2d 39, 44 (1st Cir.1987).

*The judgments of conviction and the sentences imposed on counts 1 and 30 are affirmed. The remaining convictions and sentences are vacated. The papers in the case are remitted to the district court for such entries as may be required to implement the foregoing.*