# United States Court of Appeals
## For the First Circuit

No. 05-1824

UNITED STATES OF AMERICA,

Appellee,

v.

KURT H. THOMPSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lipez, Circuit Judge,

Cyr and Stahl, Senior Circuit Judges.

Edward S. MacColl, with whom Thompson, Bull, Furey, Bass & MacColl, LLC, P.A. was on brief for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief for appellee.

June 7, 2006

**CYR, <u>Senior Circuit Judge</u>.** Defendant Kurt H. Thompson challenges the district court order convicting him of conspiring to distribute and possess with intent to distribute 500 or more grams of cocaine. <u>See</u> 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii), 846. We affirm.

## I

## BACKGROUND

In 2003, Justin Canney began purchasing large supplies of high-purity, uncut cocaine from Jason Higgins in New York for resale in Maine. Defendant Thompson soon began purchasing from five to twenty ounces of cocaine per week from Canney, which he resold to his own customers, whom he identified, <u>inter</u> <u>alia</u>, as "Jared," "Dan," and Frank Cicero, who was also a customer of Canney's. Cicero in turn resold the cocaine he acquired from Canney and Thompson to his own clients. Subsequently, however, Cicero and Thompson had an argument, and Cicero informed Canney that he henceforth would purchase cocaine only from him, and not from Thompson. Eventually Canney asked Thompson to "cut" the pure cocaine (<u>viz.</u>, add fillers to increase the volume and the street value of the drug) which Canney received from New York, because Canney was worried that his live-in girlfriend might discover his drug dealing. Canney's illicit activities eventually became the focus of a United States Drug Enforcement Agency (DEA) investigation, during which his house and person were placed under

surveillance.

In May 2004, Canney sold Thompson two and one-half ounces of pure cocaine, and asked that Thompson return it to him "cut," for resale to Cicero. On May 3, Thompson arrived at the Canney residence with five ounces of cut cocaine. Canney concealed the cocaine in a false-bottom cannister, and he and Thompson drove away in Canney's car to deliver the drugs to Cicero. After Canney committed several traffic violations, the police, who were cooperating with the DEA investigation, stopped the vehicle and with Canney's consent, performed a limited search of the vehicle. No incriminating evidence was disclosed. As planned, the police then allowed Canney and Thompson to drive off, followed by undercover DEA agents. Immediately, Canney made several evasive driving maneuvers, drove to a vacant lot, and placed several cell phone calls.

In due course, Canney and Thompson stopped at a restaurant for lunch. Undercover agents managed to station themselves near the Canney and Thompson table, and overheard their conversation. Thompson stated that he was "freaked out" by the traffic stop, and when Canney told Thompson how to dispose of cocaine quickly (<u>viz.</u>, dissolving it in water), Thompson stated that he had "tucked" the evidence during the traffic stop. Upon exiting the restaurant, Canney and Thompson were placed in custody. Thompson was found to have $3000 in cash.

-3-

After questioning Canney and Thompson, the DEA agents decided to arrest Canney, but released Thompson due to insufficient evidence that he had been involved in the ongoing drug distribution engaged in by Canney. Canney eventually entered into a plea agreement to testify as to Higgins' and Thompson's participation in Canney's drug enterprise. The government sent Thompson a target letter, and on July 2, 2004, Thompson was arrested, and later indicted on one count of conspiring to distribute and possess, with intent to distribute, 500 grams or more of cocaine, see 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii), 846. Following a two-day jury trial, Thompson was found guilty. He now appeals from the ensuing judgment of conviction.

**II**

**DISCUSSION**

**A.    The Fifth Amendment Claim**

Thompson contends that the district court abused its discretion in denying the motion for mistrial made after DEA Special Agent Wolf testified that, following Thompson's arrest, "[Thompson] declined to make much of any statement." Thompson maintains that Wolf's testimony constituted an improper and unfair comment on Thompson's Fifth Amendment right not to be compelled to be a witness against himself.

During direct examination, the government asked Agent Wolf: "And what is it that [defendant] told you back at the police

-4-

station?" Wolf answered: "He declined to make much of any statement other than . . ." The district court sustained defense counsel's objection, and Wolf continued with his testimony. Government counsel then asked: "Did [defendant] say anything to you?" Wolf responded: "That they [Thompson and Canney] were going to meet Cicero." Wolf then testified as to Canney's comments and actions on May 3, 2004. Only then did defense counsel move for a mistrial or for a cautionary instruction based on Wolf's comment that Thompson had "declined to make much of any statement." The district court denied the motion for mistrial, agreed to give a cautionary instruction, but warned defense counsel that such an instruction might cause the jury to focus on Wolf's comment more than it had already done so. Defense counsel advised the court that the defense did not want the curative instruction.

The defendant has a constitutional right to remain silent following arrest, and it is inappropriate for the government intentionally to make or solicit comments concerning a defendant's exercise of that right. See Griffin v. California, 380 U.S. 609, 615 (1965); United States v. Figueroa-Encarnacion, 343 F.3d 23, 33 (1st Cir. 2003). Any such comment improperly invites the jury to infer from the defendant's silence that he had something to hide. When a defendant challenges such a comment, the district court must inquire "'(w)hether the language used was manifestly intended or was of such a character that the jury would naturally and

-5-

necessarily take it to be a comment on the failure of the accused to testify.'" Id. (citation omitted). Where the comment is ambiguous, however, we will not lightly infer either that the government intended, or that the jury necessarily drew, the most prejudicial meaning. See United States v. Taylor, 54 F.3d 967, 979 (1st Cir. 1995); United States v. Lilly, 983 F.2d 300, 307 (1st Cir. 1992). Moreover, even if we were to respond to such a query in the affirmative, we would not reverse where the government demonstrates that the comment was harmless beyond a reasonable doubt. See United States v. Mooney, 315 F.3d 54, 61 (1st Cir. 2002); Lilly, 983 F.2d at 308-09 (noting that new trial is warranted only "where 'the offending conduct so poisoned the well that the trial's outcome was likely affected' or when, alternatively, 'the breach was so egregious that reversal becomes a desirable sanction to forestall future prosecutorial trespasses'") (citation omitted). Finally, pertinent to the harmless-error analysis would be, inter alia, "'the severity of the misconduct, whether it was deliberate or accidental, the context in which it occurred, the likely curative effect of the judge's admonitions and the strength of the evidence against the defendant.'" Id. at 308 (citation omitted).

We conclude that the district court committed no manifest abuse of discretion in denying the Thompson motion for mistrial. See United States v. Rullan-Rivera, 60 F.3d 16, 18 (1st Cir. 1995);

-6-

Lilly, 983 F.2d at 308 (noting that district court is in better vantage to determine if any harm resulting from the comment necessitates mistrial). "[R]emarks must be examined in context rather than in isolation in order to ascertain if Fifth Amendment concerns are implicated." Id. at 307. Here, there is no evidence that the prosecutor intentionally solicited the Wolf comment. In fact, since the prosecutor had asked Wolf what Thompson had told him at the police station, Wolf's answer was non-responsive. Further, Wolf did not state that Thompson refused to make a statement, but that he did not make "much" of a statement. See Kibbe v. DuBois, 269 F.3d 26, 38-39 (1st Cir. 2001) (noting case law holding that in some circumstances, once defendant waives his right to remain silent and makes a statement, it may be permissible to comment on what statements he did not make). Before Wolf could elaborate, however, the district court sustained defense counsel's objection. No further comment was made on the matter. See Lilly, 983 F.2d at 307 (noting that improper comment was less likely to cause harm where it was an "isolated instance" during a long trial).

Several minutes later, defense counsel abruptly moved for a mistrial,[1] and the district court offered to give a curative

---

[1]The unexplained delay in moving for mistrial suggests that defense counsel initially did not view the Wolf comment as so prejudicial that it warranted a new trial. Unless the defendant lodges a contemporaneous objection, rarely will we infer that a comment was unduly prejudicial. See Taylor, 54 F.3d at 979.

instruction. See United States v. Freeman, 208 F.3d 332, 339 (1st Cir. 2000) ("Where 'a curative instruction is promptly given, a mistrial is warranted only in rare circumstances implying extreme prejudice.'") (citation omitted); United States v. Sepulveda, 15 F.3d 1161, 1184 (1st Cir. 1993) ("[C]ourts have long recognized that, within wide margins, the potential for prejudice stemming from improper testimony or comments can be satisfactorily dispelled by appropriate curative instructions."); cf. Mooney, 315 F.3d at 61 (noting that improper comment on defendant's silence was cured by emphatic and prompt curative instruction); Lilly, 983 F.2d at 308 (same). Defense counsel voluntarily declined this offer after the court cautioned that an instruction might invite the jury to focus on the Wolf comment more than it had when the comment was made. See United States v. Brandon, 17 F.3d 409, 446 (1st Cir. 1994) ("The level of prejudice, if any, was not sufficiently significant to overturn the judge's decision to accept the defendants' tactical choice to forgo more appropriate methods of addressing the potential prejudice in favor of the unrealistic and unnecessary solution of a dismissal or a new trial."). In its final charge, the district court emphatically instructed the jury on the presumption of innocence and the government's burden to prove the alleged offense beyond a reasonable doubt (e.g., "The law does not compel any defendant in a criminal case to take the witness stand and testify. No presumption of guilt may be raised and no

inference of any kind may be drawn from the fact that Kurt Thompson did not testify.  For any of you to indulge such an inference or suggestion would be most improper."), see Mooney, 315 F.3d at 61; Taylor, 54 F.3d at 980; United States v. Turner, 892 F.2d 11, 13-14 (1st Cir. 1989), and we normally presume that juries follow their instructions, see Sepulveda, 15 F.3d at 1185.  We therefore conclude that the district court permissibly found that the prosecutor did not intentionally solicit the Wolf comment and that it was not "of such a character that the jury would naturally and necessarily take it to be comment on the failure of the accused to testify." Figueroa-Encarnacion, 343 F.3d at 33.

In any event, the government's case against Thompson was remarkably strong.  See Taylor, 54 F.3d at 980 (relying on the "potency of the government's proof," where testimony was "unequivocal and corroborated on many points," in concluding that prosecutor's comments were not prejudicial).  To cite but a few examples, Canney testified in detail about his multiple drug transactions with Thompson during 2003 and 2004, about Thompson's agreement to "cut" the cocaine supplies, and that Thompson was reselling his cocaine to customers including Frank Cicero. Canney's live-in girlfriend testified that Canney and Thompson frequently associated, and that she once observed cocaine inside Thompson's Dodge Truck.  Law enforcement agents attested to their surveillance on May 3, 2004, including Thompson's suspicious

behavior and incriminating remarks prior to his detention, to the drugs and other incriminating evidence seized in the searches of the Canney car and home, and to the discovery that Thompson was carrying $3000 in cash at the time he was detained. Thus, even if we were to assume, arguendo, that the Wolf comment adverted to Thompson's exercise of his Fifth Amendment rights, that comment was isolated in context, the court afforded defendant an adequate remedy which he freely declined, and the government's case vastly outweighed any potential for prejudice.

## B.   The Co-conspirator Statements

Next, Thompson contends that the district court erred in admitting into evidence – as a statement made by Thompson's co-conspirator under Federal Rule of Evidence 801(d)(2)(E) – Frank Cicero's comment to Canney that he now wanted to buy his drugs only from Canney because Cicero and Thompson had had a falling out. Thompson maintains that the Cicero statement is inadmissible hearsay since the government did not present any evidence that he and Cicero were co-conspirators, or that Cicero made the statement "in furtherance of the conspiracy," and that Cicero instead stated that he no longer wanted to be associated with Thompson.

District court rulings admitting evidence under Rule 801(d)(2)(E) are reviewed only for clear error. See United States v. Castellini, 392 F.3d 35, 50 (1st Cir. 2004). Following the procedures set forth in United States v. Ciampaglia, 628 F.2d 632,

638 (1st Cir. 1980), the district court provisionally admitted the Cicero statement. At the close of all the evidence, the district court explicitly ruled that the government had shown by a preponderance of the evidence that the Cicero statement met all requirements of Rule 801(d)(2)(E). See United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977) (requiring that court make explicit findings that it is "more likely than not that the declarant and the defendant were members of a conspiracy . . . and that the statement was in furtherance of the conspiracy").

First, Thompson never raised the argument below that the Cicero statement was inadmissible on the ground that the government failed to prove that Thompson and Cicero were members of the same conspiracy. Consequently, it is forfeited on appeal. See United States v. Paradis, 351 F.3d 21, 28 n.6 (1st Cir. 2003).[2] Second, the Cicero statement "furthered" the conspiracy in that it placed Canney on notice that two of his co-conspirators – Thompson and Cicero – no longer intended to deal directly with one another. Cicero did not state his intention to withdraw from the extant conspiracy, however, nor was it essential to their status as co-conspirators that he and Thompson continue to maintain direct contact with one another. See United States v. Soto-Beniquez, 356

_____

[2]The Thompson forfeiture is hardly a surprise, given the trial evidence that Canney, Thompson, and Cicero were all drug sellers with a common source of supply (viz., Higgins in New York), and that Canney and Thompson were on their way to deliver cocaine to Cicero on the day of their arrest.

-11-

F.3d 1, 19 (1st Cir. 2003) ("The government need not show that each conspirator knew of or had contact with all other members."), cert. denied, 541 U.S. 1074 (2004).  The district court thus made all the necessary findings of fact required by Petrozziello, none of which are clearly erroneous.  Consequently, it acted well within its discretion in admitting the Cicero statement under Rule 801(d)(2)(E).

## C.   **The Co-conspirator's Guilty Plea**

Thompson next contends that the district court erred in allowing the government to introduce, in its case in chief, the fact that Canney and Higgins had entered a guilty plea to the conspiracy charge, and in not providing a cautionary instruction that the jury should only consider the evidence as it pertained to the credibility of Canney and Higgins, not to Thompson's guilt.

Thompson incorrectly states that the court did not give a limiting instruction.  In its final charge, the court stated: "As for the guilty pleas of Jason Higgins and Justin Canney, you may consider their respective pleas in assessing their individual credibility, but you must not consider those guilty pleas as any evidence against Kurt Thompson."  As Thompson lodged no objection to the admission of this evidence, but instead elicited the same evidence during cross-examination to attack the credibility of the government's witnesses, we find no error in its admission in evidence.  See United States v. Dworkin, 855 F.2d 12, 30 (1st Cir.

1988) (noting that evidence of witness's guilty pleas is admissible to "dampen the effect of an anticipated attack on the witness's credibility," provided jury is so instructed); see also United States v. Sullivan, 85 F.3d 743, 749 (1st Cir. 1996) (finding "no plain error in admitting certain testimony when, among other problems, the testimony was elicited by defense counsel on cross-examination") (citation omitted).

## D. **The Anonymous Letter**

Next, Thompson contends that the district court erroneously admitted in evidence – as Thompson's own incriminating statement – an anonymous handwritten letter Canney received in jail one week after his May 3 arrest, since the government failed to adduce evidence (e.g., a handwriting expert) that the letter was in fact sent by Thompson.

We discern no abuse of discretion in the admission of this letter. "Anonymous correspondence may be sufficiently distinctive in its 'appearance, contents, substance, internal patterns or other distinctive characteristics,' within the meaning of Fed. R. Evid. 901(b)(4), to meet the authentication requirement." United States v. Bello-Perez, 977 F.2d 664, 671 (1st Cir. 1992); United States v. Ingraham, 832 F.2d 229, 236 (1st Cir. 1987). A document need not be signed or proven to be in the defendant's handwriting to be authenticated. See Bello-Perez, 977 F.2d at 671; United States v. McMahon, 938 F.2d 1501, 1508-09 (1st

Cir. 1991) (noting that authentication of unsigned note may be based on circumstantial indicia of authorship).

The anonymous letter's content precisely fits Thompson's circumstances and predicament in May 2004. Coming only one week after the Thompson and Canney joint arrests, the letter's author stated that "the target letter they gave me still has me losing sleep at night," a plain reference to the target letter sent to Thompson after Canney admitted, to law enforcement agents, Thompson's complicity in his drug distribution. See Fed. R. Evid. 901, advisory committee note example (4) (noting that a document "may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him"). The author stated that "they let me go . . . because I didn't say anything," a clear reference to the fact that Thompson was released from custody after his arrest on May 3, 2004 for lack of evidence, whereas Canney was not.

Finally, Canney testified that he recognized the return address, provided in the letter, as Thompson's residence. See 5 Jack B. Weinstein and Margaret A. Burger, Weinstein's Evidence ¶ 901(b)(4)[02], at 901-67 (1991) (noting that "return address" is valid indicium for authentication purposes). Given these internal indicia, the district court did not abuse its discretion in admitting the letter into evidence as a statement of the defendant. See Fed. R. Evid. 901(a) (noting that authentication of evidence

"is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims").

## F.    The Sufficiency of the Evidence

Finally, Thompson contends that the district court erred in denying his motion for judgment of acquittal because the government proved at most that he and Canney had a mere seller-buyer relationship, which is insufficient to establish a drug conspiracy, see United States v. Gore, 154 F.3d 34, 40 (1st Cir. 1998), and did not establish the requisite conspiratorial "agreement" or "meeting of minds."

We review de novo the denial of a motion for judgment of acquittal. See United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006). Viewing the evidence and credibility determinations in the light most favorable to the verdict, we simply inquire whether a reasonable factfinder could have found defendant guilty beyond a reasonable doubt. See id.

The government was required to establish that Thompson agreed with Canney and others, albeit tacitly, to commit the substantive crime of cocaine distribution, that this was the object of their agreement, and that Thompson knowingly and voluntarily participated in the conspiracy. See United States v. Santiago, 83 F.3d 20, 23 (1st Cir. 1996). This is not a close question.

The government adduced ample evidence that Thompson and Canney were involved in much more than a mere one-time or

-15-

transitory seller-buyer relationship. In distinguishing a conspiracy from a mere vendor-vendee arrangement, the core consideration is "whether the evidence surrounding the transaction(s) is sufficient to allow a fairminded jury to find beyond a reasonable doubt that A knew that B was reselling the drugs, and intended to facilitate the resales." Id. at 24. During their extended relationship, Thompson purchased for resale a total of 4 kilos of cocaine from Canney, and Thompson expressly told Canney that he was reselling it to his own clients, including Frank Cicero. Thompson cut the cocaine for Canney and for himself. On May 3, 2004, Thompson and Canney were on their way to deliver drugs to Cicero. Subsequent searches uncovered large quantities of drugs and cash, thus confirming that this joint drug distribution network was entrenched, and most definitely not a one-time, small-scale sales transaction. We accordingly conclude that the government adduced more than enough evidence that Thompson "agreed" to conspire with Canney and others in a cocaine distribution scheme. Consequently, we affirm the jury verdict.[3]

---

[3]Thompson also argues that the district court erred in allowing the government to adduce evidence that his Dodge Truck had a license plate which read "DIRRTY," because that evidence was irrelevant and unfairly prejudicial. As he did not object to this evidence in the district court, we review only for plain error. See United States v. Vazquez-Rivera, 407 F.3d 476, 483 (1st Cir.), cert. denied, 126 S. Ct. 279 (2005). We find none. The government offered the evidence to show that Thompson drove his girlfriend's vehicle when engaging in drug-related business, since her vehicle had a less conspicuous license plate, and Thompson wanted to avoid drawing attention.

**Affirmed**.