# United States Court of Appeals
## For the First Circuit

No. 23-1447

UNITED STATES OF AMERICA,

Appellee,

v.

JORGE LUIS ARMENTEROS-CHERVONI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Raúl M. Arias-Marxuach, U.S. District Judge]

Before

Barron, Chief Judge,
Gelpí and Montecalvo, Circuit Judges.

Tina Schneider for appellant.

Julian Nahuel Radzinschi, Assistant United States Attorney,
with whom Gregory B. Conner, Assistant United States Attorney,
Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief,
Appellate Division, and W. Stephen Muldrow, United States
Attorney, were on brief, for appellee.

March 20, 2025

**BARRON**, **Chief Judge**.    In 2023, Jorge Luis Armenteros-Chervoni ("Armenteros"), an attorney in Puerto Rico, was convicted of five offenses in the United States District Court for the District of Puerto Rico.  The convictions related to a visit that Armenteros made on a single day to a federal correctional institution in the Commonwealth.  Three of the convictions were for violating 18 U.S.C. § 1001(a)(2) by "mak[ing] any materially false, fictitious, or fraudulent statement or representation."  The other two were for violating 18 U.S.C. § 1791(a)(1) and (b)(4) by attempting to "provide[] to an inmate of a prison a prohibited object."

On appeal, Armenteros contends that the convictions must be vacated either because the indictment setting forth the underlying charges was multiplicitous or for trial error.  We agree that two of the three § 1001(a)(2) convictions and one of the two § 1791(a)(1) and (b)(4) convictions must be vacated because the underlying charges were multiplicitous.  Because we see no merit in his claims of trial error, we affirm the other two convictions.

## I.

## A.

The operative indictment was handed up on July 14, 2022. It charged Armenteros with various federal crimes in connection with his visit on December 22, 2021, to the Metropolitan Detention

Center ("MDC"), a U.S. Bureau of Prisons ("BOP") correctional facility in Guaynabo, Puerto Rico.

The first two counts charged Armenteros with violating 18 U.S.C. § 1791(a)(1) and (b)(4), which make it a crime for a person to "provide" -- or "attempt" to provide -- an inmate at a federal correctional facility with "a prohibited object." The statute then defines "prohibited object" to include, among other things, "a phone or other device used by a user of commercial mobile service." Id. § 1791(d)(1)(F). Count One alleged that Armenteros committed this violation by attempting to provide "two Palm brand cellular telephones" to "inmates housed at MDC" during the visit to MDC. Count Two charged him with violating § 1791(a)(1) and (b)(4) by attempting to do the same as to "seventy-five SIM (Subscriber Identity Module) cards for phones."

The remaining counts in the indictment -- Counts Three through Five -- charged Armenteros with violating 18 U.S.C. § 1001(a)(2), which prohibits a person from making a "false . . . statement" to a federal official. Count Three charged him with violating § 1001(a)(2) by, "[o]n or about December 22, 2021," "falsely stating that he did not have within his possession any 'Telephones-any type,' or any 'Electronic Devices' on BOP Form BP-A0224 (Notification to Visitor) on a visit to" one inmate that he named on the form. Count Four charged him with violating that provision at that same time by falsely stating on

- 3 -

a different "Notification to Visitor" form that he did not have within his possession any of those items "on a visit" to a different inmate that he named on that form. Count Five charged him with violating § 1001(a)(2) -- once again, on or about the same date -- by falsely stating on yet a third "Notification to Visitor" form that he did not have within his possession any of those items "on a visit" to a third inmate that he named on the form.

**B.**

Before trial, Armenteros moved in accordance with Federal Rule of Criminal Procedure 12 to challenge the indictment on multiplicity grounds. "An indictment is multiplicitous when a single offense is charged in more than one count . . . ." United States v. Serino, 835 F.2d 924, 930 (1st Cir. 1987). A multiplicitous indictment runs afoul of the U.S. Constitution's Fifth Amendment's Double Jeopardy Clause, which prohibits multiple punishments for a single offense. U.S. Const. amend. V.

Armenteros contended that Counts One and Two were multiplicitous because the conduct alleged across the two counts amounted to just one violation of 18 U.S.C. § 1791(a)(1) and (b)(4), rather than, as charged in the indictment, two violations of those provisions and so two separate § 1791(a)(1) and (b)(4) offenses. He further contended that Counts Three, Four, and Five were multiplicitous because the conduct alleged across those three

- 4 -

counts amounted to just one violation of 18 U.S.C. § 1001(a)(2), rather than, as charged in the indictment, three violations of that provision and so three separate § 1001(a)(2) offenses. Accordingly, he moved for the District Court to either dismiss the indictment or order the government to "choose two non-multiplicitous counts."

In response, the government contended that the motion must be dismissed without prejudice on the ground that Armenteros's motion was "premature" because "double jeopardy is a post-trial remedy." The government contended in the alternative that the motion was meritless because the counts were not multiplicitous.

The District Court denied Armenteros's motion without prejudice on the ground that "dismissal of any counts at this stage on double jeopardy grounds is premature." But see Fed. R. Crim. P. 12 (requiring motions alleging "a defect in the indictment" -- including "charging the same offense in more than one count (multiplicity)" -- to be "raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits"); United States v. Pires, 642 F.3d 1, 16 (1st Cir. 2011) (requiring the government to choose between multiplicitous counts is "one option, but not the only option"). The District Court informed Armenteros that he could "move for post-conviction relief on the grounds advanced in the Motion to Dismiss if he is ultimately convicted on

- 5 -

the counts he asserts are multiplicitous." Armenteros did not raise the multiplicity issue in front of the District Court again.

## C.

At trial, the government presented the testimony of Marlon Laguna-Santos, an incarcerated inmate at MDC. Laguna testified that he had previously possessed cellphones and SIM cards while incarcerated in the state system, but that he did not know Armenteros. Laguna then testified that he successfully smuggled various contraband -- including phones, SIM cards, drugs, cigarettes, and caulking material -- into MDC in August of 2020 after being promised $50,000 to do so.

The District Court gave a limiting instruction following this testimony. It stated that the testimony about the August 2020 smuggling incident could be considered only for the limited purpose of "determining whether there is a demand in MDC for contraband" and the "different methods by which contraband is attempted to be introduced at MDC." The District Court also instructed the jury that there was "no evidence that Mr. Armenteros was involved in this particular incident that was just narrated by Mr. Laguna[-]Santos."

Laguna also testified about a second smuggling episode at MDC in 2020 -- this time involving "[c]ellphones, substances, a hammer, [and] a chisel" -- for which he was paid $300,000. The District Court thereafter gave another limiting instruction

substantially similar to the one that the District Court had given following Laguna's testimony as to the August 2020 smuggling incident.

Laguna further testified that incarcerated leaders of criminal organizations need cellphones while in prison because they have to "maintain respect in the free community," "keep a watch over what is [theirs]," and "make sure that everything tallies and nothing is stolen from [them]." Laguna then explained the need for multiple SIM cards, testifying that these leaders would use "one for business," "one for family," and "another one . . . for different things like ordering people to be killed."

At the close of Laguna's direct examination, the District Court instructed the jury as follows:

> I do want to instruct the jury that in addition to the prior limiting instructions, the jury should note that it is instructed that it cannot use this evidence to conclude that Mr. Armenteros was involved in any particular offense or criminal conduct for which cellphones, SIM cards and chargers can be used once they enter MDC. That is not what the case is about, and this is not what that evidence could prove.

The government also presented evidence about Kendrick Morell-Torres, a client of Armenteros's for whom Armenteros had filled out, but not submitted, a BOP "Notification to Visitor" form. Ricardo Albino, an officer at MDC, testified that Morell had been sanctioned on three separate occasions in the past for

possessing a cellphone or other related device. Later, Laguna testified that Morell was a "leader of the Los Lirios housing project," who was "at war" with Laguna's organization and its "enemy on the street."

### D.

The jury found Armenteros guilty on all counts. The District Court sentenced him to nine months of imprisonment as to his conviction for each count, to be served concurrently with each other. Armenteros was also sentenced to one year of supervised release as to his convictions on Counts One and Two and three years of supervised release as to his convictions on Counts Three through Five, to be served concurrently with each other. In addition, the District Court imposed special assessments under 18 U.S.C. § 3013 on Armenteros that totaled $350. The assessments were for $25 on each of the convictions for Counts One and Two, and $100 for the each of the convictions on Counts Three through Five.

Armenteros filed this timely appeal.

### II.

A key question in considering whether charges are multiplicitous is "whether Congress intended the acts charged to constitute a single crime or plural offenses." United States v. Lilly, 983 F.2d 300, 302 (1st Cir. 1992) (citation omitted). "When Congress has the will . . . of defining what it desires to make the unit of prosecution," "it has no difficulty in expressing it."

<u>Bell</u> v. <u>United States</u>, 349 U.S. 81, 83 (1955).  Thus, "if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses."  <u>Id.</u> at 84; <u>see, e.g.</u>, <u>United States</u> v. <u>Verrecchia</u>, 196 F.3d 294, 298 (1st Cir. 1999).  "Because this issue turns on a question of statutory interpretation, our review is de novo."  <u>United States</u> v. <u>Smith</u>, 919 F.3d 1, 15 (1st Cir. 2019) (citation omitted).

**A.**

We begin with the aspect of Armenteros's challenge to his § 1001(a)(2) convictions in which he contends that they cannot stand because the underlying charges were multiplicitous.  18 U.S.C. § 1001(a)(2) criminalizes "knowingly and willfully . . . mak[ing] any materially false, fictitious, or fraudulent statement or representation" in "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States."  18 U.S.C. § 1001(a)(2).  Armenteros contends that this provision must be construed to treat as only one offense the making of identical false statements in three different BOP "Notification to Visitor" forms that are submitted at the same time, even if that same false statement is made on different "Notification to Visitor" forms that name different inmates as the inmate being visited on the date in question.  He then argues that each of the three such forms that

- 9 -

he submitted simultaneously when he was a visitor at MDC "[o]n or about December 22, 2021" contained the same false statement -- namely, the statement "No" in response to the question "Are any of the following items in your possession . . . ?" He therefore contends that, by charging him with three § 1001(a)(2) offenses, the indictment's § 1001(a)(2) counts were multiplicitous, at least given his further contention that the making of the false statement "No" on the second and third forms resulted in no additional impairment to governmental functions beyond the impairment occasioned by the making of that statement on the first form.

The government appears to concede that the making of identical false statements -- written or oral -- that do not each result in additional impairment to governmental functions constitutes only one violation of § 1001(a)(2) rather than as many violations of that provision as identical false statements were made. The government contends, however, that Armenteros's allegedly false statements on the three forms were not identical even though the statement each time was "No." As a result, the government argues that the making of each statement in question constituted a separate and independent violation of § 1001(a)(2). The government contends in the alternative that even if the three allegedly false statements were identical, the making of each of them still constituted a separate, stand-alone violation of § 1001(a)(2). That is so, according to the government, because of

- 10 -

the distinct impairment of governmental functions that the making of each false statement caused. For the reasons we next explain, we are not persuaded by either contention.

**1.**

To make the case that Armenteros separately violated § 1001(a)(2) in each BOP visitor form that he submitted because the allegedly false "No" statement contained in each form was different from the one made in the other forms, the government first emphasizes that each such form named a different inmate to be visited. The government contends that it follows from that fact that, in submitting each of the forms, Armenteros made a separate false statement that was different from -- and so not identical to -- the false statement that he made in submitting each of the other forms.

The government's contention depends on its assertion that Armenteros, by giving the "No" response, stated on each form that "he was not in possession of [the listed items] <u>for his visit for a given inmate</u>" (emphasis added). We disagree, however, that Armenteros made that statement on any -- let alone each -- of the three forms that he submitted.

Each BOP visitor form that Armenteros submitted asked: "Are any of the following items in your possession, or in possession of children in your party under 16 years of age?" On

- 11 -

each form, Armenteros checked "No" next to all of the listed items, including "Telephones-any type" and "Electronic Devices."[1]

To be sure, each form also contained a line marked "Name of Inmate To Be Visited," on which Armenteros filled in the name of one of the three clients that he planned to visit. But, with respect to what items he, as a person filling out the form, was in possession of, each form asked of him only: "Are any of the following items in your possession . . . ?" And, in asking that question, none of the forms that he submitted asked, as the government contends that each form did, whether the listed items were in his possession "for" the visit to any particular inmate.

So, the government is in effect asking us to read into the form's direct query -- "Are any of the following items in your possession . . . ?" -- an implicit query about whether the visitor was in possession of them with respect to a visit to a particular

_____

[1] The government notes that Armenteros in fact made two separate false statements on each of the three forms that he submitted, because he filled out "No" with respect to not only "Telephones-any type," but also "Electronic Devices." The government did not charge Armenteros, however, with thereby committing two violations of § 1001(a)(2) by submitting each form. Rather, it charged him with only one such violation on each form, such that his convictions were each predicated on his having made only one -- rather than two -- false statements.

person at the facility. By its plain terms, however, that is not what the form asked.

Of course, the form no doubt asks the question at issue at least in part to ensure that various listed items are not brought to inmates. But the question that the form asks the visitor to the facility is not: "will you be possessing" any of the listed items while visiting the inmate you name as the inmate you are visiting. The question the form asks is "are you in possession" of the listed items, full stop.

Indeed, if Armenteros had falsely answered "No" to the question that the form did ask but had left blank the name of the inmate that he was visiting, he still would have made a false statement, insofar as he in fact was in possession of a "[t]elephone[]" or "[e]lectronic [d]evice[]." Nor do we understand the government to suggest otherwise. Therefore, the question at issue concerned what he was in possession of, not what he was in possession of with respect to a specific inmate that he was visiting.

Thus, we are not persuaded by the government's contention that Armenteros made different -- rather than identical -- false statements in submitting each form when he answered the question about the items that he possessed. Rather, on each form, he was asked an identical question -- "Are any of

the following items in your possession . . . ?" -- and on each form he gave an identical answer to that question: "No."

In other words, Armenteros gave the identical false statement three times, rather than three false statements that were each different from one another.  He thus acted no differently than he would have if he had been asked orally by the same prison official at the time that Armenteros submitted the forms in question whether he was then in possession of the listed items and he had answered identically -- but falsely -- "No" to that same question each time.  Indeed, the government conceded at oral argument that a visitor who says three identical false statements to the same federal official in response to the same question being asked three times during a single interaction may not be charged with three separate violations of § 1001(a)(2).  We thus do not see -- nor does the government explain -- why the fact that the statements here are written, or that they are scattered across three different documents, make any difference.

## 2.

The government's fallback contention draws on the Ninth Circuit's holding that, even where the same false statements are involved, there is no problem in separately charging each false statement as a separate offense if the "later false statements further impaired the operations of the government." United States v. Rosen, 365 F. Supp. 2d 1126, 1136-37 (C.D. Cal. 2005) (quoting

- 14 -

United States v. Salas-Camacho, 859 F.2d 788, 791 (9th Cir. 1988)).

The government contends that, although we have not previously done so, we should follow the Ninth Circuit's lead. The government further contends that Counts Three through Five were not multiplicitous because each respective allegedly false statement, even if identical to one another, "impaired government operations in a different way (including requiring the government to investigate different inmates for potential contraband possession)."

Even if we were to adopt the Ninth Circuit's approach, however, there would remain the question whether, under that approach, there is a multiplicity problem here. The answer to that question turns, in part, on how the "additional impairment" analysis proceeds.

The Ninth Circuit's analysis in Salas-Camacho is instructive. 859 F.2d at 791. There, the defendant had falsely denied carrying any goods to declare to a primary customs inspector and later made that same denial to a secondary customs inspector. Id. The Ninth Circuit held that the second denial further impaired the operations of the government because it was made to "a separate official . . . with different duties," such that "the ability of

both officials to carry out their respective functions [wa]s impaired." Id.

Here, however, Armenteros submitted the three forms that contained the same false denial of his possession of prohibited objects to the same officer at MDC at the same time. We do not see how that officer's ability to carry out his official duty -- inspecting visitors for contraband -- was further impaired by Armenteros's submission of three forms, each of which contained the same false denial, than the officer's ability would have been had Armenteros submitted only one such form. Cf. United States v. Olsowy, 836 F.2d 439, 443 (9th Cir. 1987) (holding that two separate statements made by a claimant to the same Secret Service agent could not be the subject of multiple convictions because "[o]nce he misled the agent, repeating the lie adds little or nothing to the harm caused to the Secret Service's inquiry"). Nor does the government point to any case with remotely analogous facts to this one that has been deemed to have caused the further impairment that the Ninth Circuit's approach requires to be present.

The government does argue that Armenteros's false statements each resulted in a distinct impairment of governmental functions because each false statement required the government to

investigate a different inmate for potential contraband possession. But here, too, we are not persuaded.

We do not dispute that the government had reason to investigate three different inmates for having been provided a prohibited object because Armenteros, on each form, filled in the "Name of Inmate To Be Visited" with the name of a different inmate. But the government's reason to investigate those three inmates -- rather than any others or some subset of those three -- cannot be attributed to any misdirection about whom to investigate caused by the allegedly false statement itself. The reason for investigating those inmates specifically -- as opposed to any or all others -- stems from the statements that Armenteros made on the forms he submitted about whom he was visiting. Yet the government does not dispute that those statements were themselves true statements, and we do not understand the Ninth Circuit's approach to make a person criminally liable under § 1001(a)(2) for the official time and expense that a true statement occasions.

Consider in this regard if Armenteros had made only one false statement, by checking the "No" boxes next to "Telephones-any type" and "Electronic Devices" on one form but checking "Yes" on those boxes on the other two forms, while also still filling out the name of the inmate he was visiting on those two forms. In that event, the government would still have had reason to

- 17 -

investigate whether those two inmates had been given a prohibited object. Thus, the false statement itself would not have given rise to the only claimed additional impairment of government functions that the government has identified here -- the investigation of whether a named inmate possessed the prohibited object.

Accordingly, we conclude that the § 1001(a)(1) counts were multiplicitous. And so there remains to address with respect to this ground for challenging those convictions only the question of the proper remedy.

**3.**

Armenteros contends that the proper remedy is to vacate all his § 1001(a)(2) convictions -- and the accompanying sentences -- and to instruct that any new prosecution based on the conduct charged in the underlying § 1001(a)(2) counts be limited to one count alleging a violation of that statute. Armenteros relies on United States v. Langford for the proposition that "a multiplicitous indictment may improperly prejudice a jury by suggesting that a defendant has committed several crimes -- not one." 946 F.2d 798, 802 (11th Cir. 1991) (citation omitted).

We rejected this very argument, however, in Lilly, 983 F.2d at 305. There, we declined to employ "so sweeping a remedy" based on an alleged "risk that the jury was prejudiced by the prosecutor's overly ambitious charging decision." Id. (noting the

- 18 -

reduced risk of spillover effect where, as here, the same evidence would be admitted in a trial for the single count as was admitted for the multiplicitous charges). Instead, we followed "our long-settled practice" and concluded that the remedy was "simply to vacate the offending convictions and sentences." Id. (citation omitted). Armenteros develops no argument in his briefs as to why his case is any different.[2] We thus see no reason to depart from our approach in Lilly.

We therefore vacate Armenteros's convictions and corresponding sentences as to Counts Four and Five because those counts are multiplicitous with Count Three. We affirm the conviction, the nine-month term of imprisonment, three years of supervised release, and $100 special assessment on Count Three.

**B.**

Armenteros separately challenges his two convictions for violating 18 U.S.C. § 1791(a)(1) and (b)(4) on the ground that the underlying charges were multiplicitous. These convictions were based on two counts that charged Armenteros with attempting to provide "a prohibited object" to an inmate during his one visit to

---

[2] At oral argument, counsel for Armenteros suggested that this case was distinguishable from Lilly because, in that case, the trial court instructed the jury to consider each charge separately seven times, while, in this case, the trial court did so only once. Even if we look past waiver, see Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015), nothing in Lilly suggests that case turned on the number of such instructions, see 983 F.2d at 305-06.

MDC on December 22, 2021.  The first conviction was for a count that charged him with having violated the statute while visiting MDC "[o]n or about December 22, 2021" by attempting to provide an inmate with two cellphones, which the count charged as a single offense.  The second conviction was for a count that charged Armenteros with having violated that statute while at MDC at that same time by attempting to smuggle seventy-five SIM cards, which the count also treated as a single offense.  Armenteros argues that the conduct described across the two counts constituted only one violation of § 1791(a)(1) and (b)(4), not two, such that the charges underlying these two convictions were multiplicitous.  Our analysis of this contention follows.

### 1.

The text of 18 U.S.C. § 1791(a)(1) prohibits "provid[ing] to an inmate of a prison a prohibited object, or attempt[ing] to do so."  The definition of the term "prohibited object" for the purposes of the section is set forth in subsection (d)(1).  That subsection lists seven different definitions of that term:

> (d) **Definitions**.-- As used in this section --
>      (1) the term "prohibited object" means --
>          (A) a firearm or destructive device or a controlled substance in schedule I or II, other than marijuana or a controlled substance referred to in subparagraph (C) of this subsection;

- 20 -

(B) marijuana or a controlled substance in schedule III, other than a controlled substance referred to in subparagraph (C) of this subsection, ammunition, a weapon (other than a firearm or destructive device), or an object that is designed or intended to be used as a weapon or to facilitate escape from a prison;

(C) a narcotic drug, methamphetamine, its salts, isomers, and salts of its isomers, lysergic acid diethylamide, or phencyclidine;

(D) a controlled substance (other than a controlled substance referred to in subparagraph (A), (B), or (C) of this subsection) or an alcoholic beverage;

(E) any United States or foreign currency;

(F) a phone or other device used by a user of commercial mobile service . . . in connection with such service; and

(G) any other object that threatens the order, discipline, or security of a prison, or the life, health, or safety of an individual . . . .

18 U.S.C. § 1791(d)(1) (emphasis added).

Subsection (b) then sets out the punishment for each definition in subsection (d). The definition at issue here, in subsection (d)(1)(F), provides that a "prohibited object" is "a phone or other device used by a user of commercial mobile service . . . in connection with such service." 18 U.S.C. § 1791(d)(1)(F).

Armenteros does not dispute that the definition of a "prohibited object" in subsection (d)(1)(F) covers a SIM card. He thus makes no argument that, because a SIM card is merely a component part of "a phone," it is not itself an "other device used by a user of commercial mobile service . . . in connection with such service." 18 U.S.C. § 1791(d)(1)(F) (emphasis added). But cf. United States v. Hendrickson, 949 F.3d 95, 99 n.5 (3d Cir. 2020) ("The words 'or other' between the words 'phone' and 'device' show that a 'phone' is an example of the type of device that the statute covers. The word 'other' usually indicates that the term that follows it is of the same kind as the item or person already mentioned." (internal quotation marks and citations omitted)); An Act to Amend the Communications Act of 1934, Pub. L. No. 97-259, § 125, 96 Stat. 1087, 1098 (1982) (adding a section on forfeiture of communications devices and referring separately to "communications device, devices, or components thereof" (emphasis added)). Armenteros instead contends that § 1791 must be read to make the unit of prosecution "each category of prohibited objects," by which he means each distinct definition of a "prohibited object" listed in 18 U.S.C. § 1791(d)(1)(A) through 18 U.S.C. § 1791(d)(1)(F).

Armenteros reasons that because "a phone" and "other device used by a user of commercial mobile service" are both

contained within the "statutory category" of § 1791(d)(1)(F), his attempt to provide both such objects to an inmate during his December 22, 2021, visit to MDC necessarily constitutes a single offense under § 1791. That is so, he argues, regardless of how many such qualifying "prohibited object[s]" -- whether cellphones or SIM cards, singly or in combination -- were involved. Armenteros reasons that this conclusion is required based on the text of § 1791(d)(1)(F). He asserts that nothing about the provision's words -- including its use of the "or" between "a phone" and "other device used by a user of commercial mobile service" -- makes clear enough Congress's intent that attempting to provide "a phone" is a distinct offense from attempting to provide an "other device used by a user of commercial mobile service" for us to treat the charged conduct in his case as two offenses rather than one.

The government disagrees. It contends that the statute unambiguously treats attempting to provide a phone and a SIM card as two separate offenses, even when those objects are provided to a single inmate during a visit to the inmate's prison facility on a single day. The government maintains that this is the case, moreover, even if providing only multiple phones -- or only multiple "other device[s] used by a user of commercial mobile service" -- to a single inmate during a single visit would constitute just one offense.

The government's theory is that the unit of prosecution under § 1791 is the "kind of prohibited object" and that there can be multiple "kinds" contained within each separately set off statutory definition of a "prohibited object." The government then proceeds to argue that § 1791(d)(1)(F)'s use of the "or" between "a phone" and "other device used by a user of commercial mobile service" serves as the textual marker of a distinction between "kinds of prohibited objects" and thus of separate offenses. As a result, in the government's view, Congress's use of "or" in § 1791(d)(1)(F) reveals Congress's unambiguous intent to treat "a phone" as a distinct "kind of prohibited object" from "other device used by a user of commercial mobile service."

Thus, the government contends, attempting to provide each "kind of prohibited object" constitutes an independent offense, even assuming that providing multiple numbers of each such object -- whether the object is "a phone" or "other device used by a user of commercial mobile service" -- to an inmate during a single visit constitutes only a single offense. And so, the government argues, attempting to provide "a phone" and an "other device used by a user of commercial mobile service" constitutes two offenses, notwithstanding that attempting to provide multiple phones would constitute only one offense just as would attempting to provide multiple "other device[s] used by a user of commercial mobile service."

- 24 -

The government supports this contention about how to construe the provision in question by pointing to the way that "or" is used in § 1791(d)(1)(A). That provision defines a "prohibited object" to include "a firearm or destructive device or a controlled substance in schedule I or II." 18 U.S.C. § 1791(d)(1)(A). The government asserts that "a controlled substance" and "a firearm" are clearly two different "kinds of prohibited objects," such that attempting to provide both "a controlled substance" and "a firearm" would constitute two offenses. From that premise, the government reasons that because Congress used "or" to separate "a firearm" and "a controlled substance in schedule I or II" in § 1791(d)(1)(A), its use of "or" to separate "a phone" and "other device used by a user of commercial mobile service" in § 1791(d)(1)(F) clearly evinces Congress's intent to treat attempting to provide those two items as distinct offenses.

But the text of § 1791(d)(1)(A) indicates, insofar as it bears on how to construe the provision that is our concern, that Congress chose "or" followed by an "a" -- rather than just "or" standing alone -- as the textual marker for a new "kind" of prohibited object. In that regard, we note that § 1791(d)(1)(A) defines "prohibited object" as "a firearm or destructive device or a controlled substance in schedule I or II" (emphasis added). That second "a" after "or" and in front of "controlled substance in

schedule I or II" textually separates "controlled substance in schedule I or II" from "firearm" in § 1791(d)(1)(A). Yet, Congress chose <u>not</u> to include a second "a" between "phone" and "other device used by a user of commercial mobile service" in § 1791(d)(1)(F). We therefore see no basis for concluding that § 1791(d)(1)(A) supports its favored construction of § 1791(d)(1)(F).

We do emphasize, however, that it does not necessarily follow from this conclusion that just because of Congress's choice not to put "a" in front of "destructive device," someone who attempts to provide a "firearm" and a "destructive device," like a grenade, in one place at one time would have committed only one offense. Nor does it necessarily follow from this conclusion that someone who attempts to provide "a phone" and an "other device used by a user of commercial mobile service," like a pager, in one place at one time would have committed only one offense, because of Congress's choice not to put "a" in front of "other device used by a user of commercial mobile service." It may be that when an object qualifies as a "prohibited object" because it is encompassed in a definition listed in § 1791(d)(1), each such object would be capable of being charged as a single offense in its own right.

Indeed, the catch-all definition in § 1791(d)(1)(G) lends some credence to this interpretation. That definition provides that a "prohibited object" is "any other object that threatens the order, discipline, or security of a prison, or the

life, health, or safety of an individual." 18 U.S.C. § 1791(d)(1)(G). It is not evident why Congress would have intended that the government could charge the provision during a single visit of multiple objects that the catch-all covers as but one offense no matter how distinct from each other the objects were.

Furthermore, the fact that § 1791(a)(1) criminalizes attempting to provide "a prohibited object" -- as opposed to, for example, "any prohibited object" -- arguably provides support for the conclusion that Congress intended to allow each prohibited object to be charged as a single offense. That semantic choice arguably indicates the relevant unit of prosecution is the qualifying object, rather than the kind of such object.

It may be, therefore, that providing a firearm and a grenade would be capable of being charged as two offenses for the same reasons that providing two firearms could be charged as two offenses. Similarly, it may be that providing "a phone" and an "other device used by a user of commercial mobile service" would be capable of being charged as two offenses for the same reasons that providing two phones could be charged as two offenses.

To be sure, Armenteros does contend that each prohibited object does not constitute a separate crime. He cites United States v. Kerley, 544 F.3d 172, 179 n.8 (2d Cir. 2008), for the proposition that Congress's use of "a prohibited object" instead

of "any prohibited object" does not render the statute unambiguous on its own. But Armenteros does not address the import of the catch-all definition in § 1791(d)(1)(G) or the import of § 1791(d)(1)(A)'s definition of a "prohibited object" as "a firearm or destructive device" in discerning Congress's intent as to the unit of prosecution.

Armenteros does also contend that interpreting the unit of prosecution to be each prohibited object would lead to "absurd or counter-intuitive" disparities in punishment for different prohibited objects. Armenteros notes that a person convicted of providing seventy-five SIM cards, assuming SIM cards fall under (d)(1)(F), would face up to seventy-five years in prison, while a person convicted of providing a single gun would only face twenty years. But Armenteros cites no authority for the proposition that a statutory scheme that imposes a greater criminal penalty for repeated convictions of a lesser offense than for a single conviction of a greater offense is "absurd or counter-intuitive."[3]

In any event, the government does not argue that each prohibited object is itself a unit of prosecution. Its sole theory of prosecution of Armenteros for violating § 1791(a)(1) and (b)(4) has been and remains a limited one. It contends on appeal, as it

_____

[3] The only authority cited by Armenteros, United States v. Carroll, 105 F.3d 740, 744 (1st Cir. 1997), did not deal with the kind of disparity that Armenteros alleges would result if each prohibited object were a unit of prosecution under § 1791.

has throughout, that attempting to provide a "phone" and "other device used by a user of commercial mobile service" constitutes two offenses. And it does so because it contends that the word "or" between "phone" and "other device" demarcates two separate kinds of prohibited objects, such that providing a phone and an "other device" necessarily constitutes two offenses, even if providing two phones or two "other device[s]" constitutes only one such offense. For the reasons already explained, however, that theory of the unit of prosecution is mistaken.

Thus, we see no basis for rejecting Armenteros's challenge to his § 1791(a)(1) and (b)(4) convictions based on the underlying charges being multiplicitous. See United States v. Burhoe, 871 F.3d 1, 25 & n.28 (1st Cir. 2017). Accordingly, we move on to address the proper remedy.[4]

---

[4] Armenteros separately contends that we must find the § 1791 counts to be multiplicitous, because § 1791 criminalizes "the scheme," rather than "acts taken in furtherance of that scheme." He thus contends that the unit of prosecution under § 1791 is "the scheme" of providing or attempting to provide contraband rather than "the item or the category of item." As a result, he contends that he could only be charged with one violation for attempting to provide cellphones and SIM cards, as his conduct was part of a single scheme. He relies for this argument on Lilly, 983 F.2d at 302-03. But, in addition to the fact that Lilly concerned a different criminal statute, it also explained that the fact "[t]hat a criminal may plot on a large scale, envisioning a series of discrete acts as part of a grand plan, does not mean that various aspects of his felonious conduct cannot be separately charged under the bank fraud statute." Id. at 303. Thus, even assuming arguendo that § 1791 is comparable to the bank fraud statute for the purposes of discerning the unit of prosecution, Lilly does not

- 29 -

**3.**

Armenteros once again contends based on Langford that the proper remedy is to vacate all his § 1791(a)(1) convictions -- and the accompanying sentences -- and to instruct that any new prosecution be limited to one count alleging a violation of that statute. But, for the reasons given above, our decision in Lilly leads us to conclude otherwise, given that Armenteros develops no argument in his briefs as to why his case is any different from that one. We thus vacate Armenteros's conviction and corresponding sentence as to Count Two, because that count is multiplicitous with Count One. We affirm the conviction, the nine-month term of imprisonment (served concurrently with the term under Count Three), one year of supervised release (to be served concurrently with the term under Count Three), and $25 special assessment on Count One.

**III.**

Armenteros separately contends that, even if the challenge to his convictions based on the underlying charges having been multiplicitous fails, all his convictions must be vacated because of various claimed trial errors. Thus, we must address these claims of trial error as to the convictions that survive his

---

provide support for Armenteros's contention that § 1791 criminalizes the "scheme" to provide contraband rather than the discrete acts that comprise it.

challenge to them based on the charges being multiplicitous -- namely, his conviction on the charges set forth in Count One for violating 18 U.S.C. § 1791(a)(1) and (b)(4) and Count Three for violating 18 U.S.C. § 1001(a)(2).

We review a district court's evidentiary ruling for abuse of discretion when objections to it are properly preserved, as here.  United States v. Torres-Pérez, 22 F.4th 28, 34 (1st Cir. 2021).  For reasons explained below, we conclude that there is no merit to any of Armenteros's claims that the District Court abused its discretion.

## A.

Armenteros first contends that the District Court erred by failing to exclude Laguna's testimony about his prior smuggling operations into MDC and the reasons inmates seek cellphones. Armenteros argues that Laguna's testimony on those subjects had to be excluded under Federal Rules of Evidence 401 and 403 and that the District Court's failure to do so requires that we vacate his remaining § 1001(a)(2) and § 1791 convictions.

## 1.

We begin with Armenteros's arguments that it was improper under both Rules 401 and 403 for the District Court to admit Laguna's testimony about his prior smuggling operations.  We address each challenge in turn.

Evidence is relevant if it has "any tendency" to make a material fact "more or less probable." Fed. R. Evid. 401. We have previously explained that Rule 401 "set[s] a very low bar for relevance." United States v. Rodríguez-Soler, 773 F.3d 289, 293 (1st Cir. 2014). Our review as to a district court's relevancy determination is "quite deferential," United States v. Pina-Nieves, 59 F.4th 9, 21 (1st Cir. 2023), and such determinations provide grounds for reversal only in "exceptional cases," Cummings v. Standard Reg. Co., 265 F.3d 56, 63 (1st Cir. 2001) (quoting Conway v. Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987)).

Armenteros contends that Laguna's testimony about his personal experience smuggling contraband into MDC was irrelevant to the only disputed fact at trial -- "whether Armenteros knowingly attempted to smuggle cellphones into the prison" -- because none of the offenses with which Armenteros was charged were based on the smuggling incidents described by Laguna. But Laguna's testimony as to his successful smuggling operations into MDC had a "tendency" to make the material fact of Armenteros's knowledge more or less probable by showing that attempts to bring phones into MDC were not always inadvertent. Indeed, defense counsel seemed to admit as much in his closing argument, during which he contended that "no one in their right mind would think it is possible to successfully pass cellphones and SIM cards into MDC

without [them] being detected."  Thus, Laguna's testimony had a "tendency" to make the material fact of Armenteros's knowledge more or less probable.

Armenteros argues, in the alternative, that even if Laguna's testimony about his past smuggling operations is relevant under Rule 401, it still fails under Rule 403.  A trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.  "[M]arginally relevant" "background evidence" will be excluded under Rule 403, United States v. Kilmartin, 944 F.3d 315, 336 (1st Cir. 2019), if it has "the capacity . . . to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged," id. (alteration in original) (quoting Old Chief v. United States, 519 U.S. 172, 180 (1997)).  A district court, however, is "afforded 'especially wide latitude'" in making Rule 403 determinations, which are disturbed "[o]nly rarely -- and in extraordinarily compelling circumstances." United States v. Pena, 24 F.4th 46, 66 (1st Cir. 2022) (alteration in original) (quoting United States v. Habibi, 783 F.3d 1, 4 (1st Cir. 2015)).

Armenteros contends that Laguna's testimony about his prior smuggling operations into MDC was likely to confuse the jury because it shifted the focus of the trial from Armenteros's

knowledge to "whether Armenteros was enabling dangerous drug gangs to operate from within . . . the prison." We are not persuaded.

A trial court's instructions to the jury as to the limited purposes for which evidence is to be considered can have a "salutary effect" that "alleviate[s] [the] impact of unfair prejudice." United States v. Smith, 292 F.3d 90, 101 (1st Cir. 2002) (citation omitted); see also United States v. Freeman, 208 F.3d 332, 344 (1st Cir. 2000) ("Jurors are presumed to follow the court's instructions."). Here, the evidence in question was clearly probative because it tended to show Armenteros's knowledge, and, at the close of Laguna's direct examination, the District Court explicitly instructed the jury that it could not use Laguna's testimony to conclude that "Mr. Armenteros was involved in any particular offense or criminal conduct for which cellphones, SIM cards and chargers can be used once they enter MDC" because "[t]hat is not what the case is about, and this is not what that evidence could prove." Moreover, none of Laguna's testimony about his prior smuggling operations implicated Armenteros in the conduct that the testimony described. Thus, Armenteros's reliance on Kilmartin, 944 F.3d at 337, and Pires, 642 F.3d at 11, is misplaced, because, in those cases, the challenged evidence did concern either the conduct in which the defendant himself was alleged to have engaged or the character of the defendant himself.

- 34 -

Armenteros does dispute the effectiveness of the District Court's first two limiting instructions. They instructed the jury that it could only consider Laguna's testimony about his prior smuggling operations for the purpose of determining whether there was a demand in MDC for contraband and whether there were different methods by which contraband was introduced at MDC. But Armenteros fails to explain why the last limiting instruction -- which, as explained above, directly addressed the unfair prejudice that he now asserts -- failed to cure any potential prejudice from Laguna's testimony.[5] Given the probative value of the evidence, the lack of anything in it that purported to describe any conduct directly attributable to the defendant, and the careful and clear limiting instruction given by the District Court, we conclude that the District Court did not abuse its discretion in declining to exclude Laguna's testimony about his prior smuggling operations into MDC under Rule 403.[6]

---

[5] True, in Kilmartin, we found that the trial court abused its discretion in allowing evidence over a Rule 403 objection notwithstanding limiting instructions given by the trial court. See 944 F.3d at 338, 340. We did so, however, because the trial court's instruction was not given relative to the challenged evidence and "did nothing to insulate the jurors from the emotional clout of the challenged evidence." Id. at 340. That is not the case here.

[6] In challenging both Laguna's testimony and the evidence regarding Morell under Rule 403, Armenteros points to statements made by the government during rebuttal. But we see nothing in the government's rebuttal that would change our conclusion that the District Court did not abuse its discretion in concluding that the

We now turn to Armenteros's challenge -- again under Rules 401 and 403 -- to Laguna's testimony about the reasons inmates seek cellphones. Armenteros contends that Laguna's testimony as to "why the inmates wanted cellphones" and "how cellphones were illegally used by inmates" was irrelevant to the material fact of Armenteros's knowledge.

Laguna's testimony as to why inmates needed cellphones provided evidence, however, that inmates were willing to pay substantial amounts of money for them, as the government alleged was the case with respect to the inmates for whom Armenteros was allegedly providing the SIM cards in question. The high value placed on smuggled phones and other devices in prison, in turn, bears on the likelihood of whether anyone -- and thus whether Armenteros -- would knowingly attempt to bring such prohibited objects into the prison despite the obvious risks of doing so.

Laguna's testimony as to why inmates needed multiple SIM cards similarly provided evidence that SIM cards, even when not paired with phones, would be valuable to inmates. By providing evidence against the notion that a SIM card would be of no use to any inmate, Laguna's testimony tended to provide support for the government's contention that inmates were paying Armenteros for

---

probative value of the challenged evidence was not substantially outweighed by any unfair prejudice.

the SIM cards that he was allegedly providing to inmates. Thus, Laguna's testimony had a "tendency" to make the material fact of Armenteros's knowledge more or less probable by showing that there was high demand for phones and SIM cards within MDC and that the number of SIM cards he attempted to smuggle into MDC accorded with the fact that prisoners in MDC made use of multiple SIM cards.

Armenteros appears to concede that the high value placed on smuggled phones and other devices among inmates at MDC was probative of his motive and thus his knowledge. He nonetheless disputes that it was relevant "how cellphones were used in the prison," because "[v]alue is value, and it does not matter why an item is valuable." But evidence about the specific use that inmates in MDC made of cellphones and multiple SIM cards was probative of the value of those prohibited objects to inmates in that facility, because that evidence made tangible what that value was.

Armenteros alternatively contends that the District Court erred under Rule 403 by not excluding Laguna's "inflammatory" testimony about how inmates use phones and SIM cards -- which, among other things, described imprisoned leaders of criminal organizations using cellphones and SIM cards "for ordering killings." He contends that this testimony had to be excluded under Rule 403 because it resulted in unfair prejudice, even if it had probative value.

To make the case, Armenteros once again argues that this testimony impermissibly "changed the focus of the inquiry from Armenteros's knowledge to whether Armenteros was enabling dangerous drug gangs to operate from within . . . the prison." We understand the basis for Armenteros's concern, especially given that the testimony concerned the use of the relevant type of contraband in killings. But, as we have explained, we are reluctant to second-guess a district court's on-the-spot judgment about whether to permit testimony under Rule 403 when the district court has issued limiting instructions directly addressing the prejudice concern. See Smith, 292 F.3d at 101. And Armenteros develops no argument as to why the District Court's final limiting instruction failed to protect against any unfair prejudice from Laguna's testimony about how inmates use phones. Moreover, this evidence made tangible the value of the contraband in question in a way that no other evidence did.[7] Cf. Old Chief, 519 U.S. at

_____

[7] In addition to Laguna's testimony about how inmates use cellphones and SIM cards, the government did also present expert testimony by a special investigative service technician at MDC on the value of cellphones and SIM cards within that facility. "[A] judge applying Rule 403 could reasonably apply some discount to the probative value of an item of evidence when faced with less risky alternative proof going to the same point." Old Chief, 519 U.S. at 183. The expert testimony represented "less risky alternative proof" of the contraband's value than Laguna's testimony, as the expert testimony did not refer to the use of the relevant kind of contraband in killings. Id. But, especially because the most inflammatory portion of the testimony did not concern conduct in which Armenteros was described as having been

- 38 -

186-87 ("[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the [g]overnment chooses to present it."). Finally, much like the portion of Laguna's testimony about his prior smuggling operations, none of this testimony purported to describe any conduct in which Armenteros himself was claimed to have participated. So, here, too, both Kilmartin, 944 F.3d at 337, and Pires, 642 F.3d at 11, are distinguishable on the facts. We therefore conclude that, although the question is close, the District Court did not abuse its discretion in allowing Laguna's testimony about the reasons inmates seek cellphones and multiple SIM cards.

### 3.

We now turn to Armenteros's challenges to the evidence pertaining to Kendrick Morell-Torres. Armenteros contends that the District Court erred by allowing (1) the completed but unsubmitted BOP visitor form for Morell that was found in Armenteros's belongings; (2) Laguna's testimony that his

_____

a participant, we still do not find that, in consequence, the District Court abused its discretion in determining that the probative value of the testimony was not substantially outweighed by any unfair prejudice, at least given the "salutary effect" of the District Court's final limiting instruction. Smith, 292 F.3d at 101. Indeed, as even Old Chief recognized, "the mere fact that two pieces of evidence might go to the same point would not, of course, necessarily mean that only one of them might come in," 519 U.S. at 183, and there is a difference between a second-hand account of the value of contraband within a prison and a first-hand account by an inmate, who had himself possessed cellphones and SIM cards while incarcerated, of how that contraband had value.

- 39 -

organization was "at war" with a criminal organization of which Morell was a leader and that Morell was their "enemy on the street"; (3) evidence that showed Morell had been disciplined on three separate occasions for possessing a cellphone or related device at MDC prior to Armenteros's visit in December 2021; and (4) a photograph of Morell. Armenteros bases his challenge again on Rules 401 and 403.

We begin with Armenteros's contention that the District Court erred in allowing this evidence because it was not relevant. Here, Armenteros relies on the same reasons that he relied on in contending that Laguna's testimony was not relevant, namely that the evidence in question did not bear on the only issue before the jury -- Armenteros's knowledge. But, after considering each piece of the Morell-related evidence, we cannot agree that Rule 401 provides a basis for disturbing any of the convictions.

The completed but unsubmitted BOP visitor form for Morell tended to provide support for the government's theory that Morell was the intended recipient of the cellphones and SIM cards that Armenteros was carrying. Similarly, Morell's disciplinary history for possessing similar contraband and Laguna's testimony that Morell was the leader of a criminal organization, together with Laguna's testimony about leaders' particular need for cellphones, reinforced the government's contention that Armenteros intended to provide the contraband to Morell. By tending to prove

that Armenteros intended to deliver the contraband to a particular inmate within MDC, this evidence had the tendency to make the material fact of Armenteros's knowledge more or less probable.

To be sure, the government does not explain how Morell's photograph was relevant to the material fact of Armenteros's knowledge, except, we suppose, by tending to prove that the person to whom Armenteros was alleged to have been providing the contraband existed. But even if there were error under Rule 401 in admitting Morell's photograph, that error was harmless, as it is "highly probable" that the erroneous introduction of Morell's photograph did not influence the verdict. United States v. Piper, 298 F.3d 47, 56 (1st Cir. 2002). In that regard, we discern no evidence that Morell's photograph, on its own, had any unfairly prejudicial effect on the jury's verdict, and Armenteros does not argue otherwise.

Armenteros does also challenge the evidence concerning Morell on Rule 403 grounds. In doing so, however, Armenteros contends only that the evidence concerning Morell "hijacked" the trial, making it about "Morell, his drug cartel, and his war with a rival gang" rather than about "whether Armenteros knowingly attempted to smuggle contraband into the prison." We are not persuaded that the District Court abused its discretion by rejecting the Rule 403 objection to the Morell evidence.

As to the photograph of Morell, any error under Rule 403 was harmless for the same reasons discussed above. Similarly, we discern no basis in the record -- and Armenteros does not point to any -- to disturb the District Court's conclusion that neither the BOP visitor form for Morrell nor the evidence of Morell's prior disciplinary history at MDC for possessing cellphones or related devices posed a "danger of . . . unfair prejudice" that "substantially outweighed" their probative value in tending to prove his motive. Fed. R. Evid. 403. Finally, as to Laguna's testimony that Morell was the leader of a rival criminal organization, the District Court's final limiting instruction applied fully to that portion of Laguna's testimony. And, for reasons like those described above in affirming the District Court's ruling under Rule 403 as to Laguna's testimony concerning his smuggling, we see no basis for concluding that the District Court abused its discretion in permitting Laguna to provide the testimony that he gave about Morell. The testimony was plainly probative of Armenteros's knowledge by tending to prove his motive, it did not describe any conduct in which Armenteros himself was asserted to have been involved, and the limiting instruction directly addressed the prejudice concern that undergirds the Rule 403 challenge. We thus conclude that there was no abuse of discretion in the District Court's decision under Rule 403 not to exclude the evidence regarding Morell.

**B.**

Armenteros next argues that the District Court erred by "micromanag[ing]" defense counsel's closing argument. He contends that the District Court did so by placing various limitations on his closing, as these restrictions violated his Sixth Amendment right to effective assistance of counsel because they "unjustly impede[d] the ability of defense counsel from fully articulating the defense." He further argues that the restrictions violated his Sixth Amendment right to counsel of choice because they required "this particular attorney -- the one chosen by Armenteros -- to argue with one hand tied behind his back." He thus argues that his convictions under both § 1791 and § 1001(a)(2) cannot stand.

"The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations." Herring v. New York, 422 U.S. 853, 862 (1975). Thus, we "review the limitations placed on defendant's closing argument for abuse of discretion." United States v. Teleguz, 492 F.3d 80, 83-84 (1st Cir. 2007) (citation omitted). Applying that standard here, we discern no error.

Armenteros contends that the District Court wrongly prevented his defense counsel from doing the following during his closing argument: (1) using the phrase "a doubt based on reason"; (2) "alluding to [the jury's] lack of legal training"; (3) telling

- 43 -

the jury that the case was "dump[ed] on the[ir] lap"; and (4) "suggest[ing] that, during their deliberations, [the jury] should stand up and explain, out loud, why they think [the defendant] is guilty before they can find him guilty." The District Court imposed these restrictions in response to the government's motion.

Armenteros first points out that we have previously approved of the phrase "a doubt based on reason" as a way to explain reasonable doubt. See, e.g., United States v. Whiting, 28 F.3d 1296, 1303 (1st Cir. 1994). But we do not see how the District Court's prohibition of that phrase impermissibly limited defense counsel's closing argument given the fact that he was still able to fully address the concept of reasonable doubt in his closing argument. Armenteros cites no authorities to support his contention that a trial court's denial of defense counsel's preferred set of words in explaining the concept of reasonable doubt amounts to an unconstitutional limitation on defense counsel's ability to "make a proper argument on the evidence and the applicable law in his favor." Herring, 422 U.S. at 860 (quoting Yopps v. State, 178 A.2d 879, 881 (Md. 1962)).

As to the other restrictions that the District Court imposed, Armenteros contends that they did not concern the kind of "superheated rhetoric" of which our case law has disapproved in the context of reviewing arguments by the government. Even still,

a district court has "broad discretion" to ensure that an argument "not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." Id. at 862. We thus see no abuse of discretion in the District Court's decision to prohibit Armenteros's counsel from "alluding to [the jury's] lack of training," suggesting to the jury that the case was "dump[ed] on the[ir] lap[s]," or telling the jury to "stand up and explain, out loud, why they think [the defendant] is guilty before they can find him guilty," on the ground that such arguments would have been "inflammatory" or "unnecessary."

Armenteros separately contends that the District Court abused its discretion by imposing these restrictions "preemptively" in response to the government's motion. Instead, Armenteros argues, the District Court should have addressed any objections from the government after "hearing [defense] counsel's remarks in context," at which point the District Court could have used specific curative instructions or general jury instructions to remedy the effects of any problematic language employed by defense counsel. While Armenteros is correct that the District Court could have chosen to proceed in this manner, see, e.g., United States v. González-Pérez, 778 F.3d 3, 16-19 (1st Cir. 2015), Armenteros cites no authority for the proposition that this is the only way in which the District Court may exercise its wide discretion in regulating the scope and substance of closing

arguments, cf. United States v. Simpson, 974 F.2d 845, 848 (7th Cir. 1992) (upholding, under abuse of discretion review, a district court's grant of the government's motion -- prior to closing argument -- to place a restriction on defense counsel's closing argument).  We therefore reject Armenteros's contention that the District Court abused its discretion by limiting defense counsel's closing argument.[8]

## IV.

For the reasons given above, Armenteros's convictions and corresponding sentences as to Counts Two, Four, and Five are vacated.  His convictions and corresponding sentences as to Counts One and Three are affirmed.

---

[8] Armenteros's remaining challenge is that the cumulative effect of the alleged trial errors violated his right to a fair trial.  But, in light of our analysis above, there is no basis for the application of that doctrine here.  United States v. Correa-Osorio, 784 F.3d 11, 26 (1st Cir. 2015) (citing United States v. DeSimone, 699 F.3d 113, 128 (1st Cir. 2012)).